DR. ANN BARR SNITOW, PLAINTIFF-RESPONDENT, v.
RUTGERS UNIVERSITY, DEFENDANT-APPELLANT.

Argued January 22, 1986—Decided March 17, 1986.

*John J. Peirano, Jr.* argued the cause for appellant (*Carpenter, Bennett & Morrissey,* attorneys; *Edward F. Ryan* of counsel; *Linda B. Celauro* on the brief).

*Arnold Shep Cohen* argued the cause for respondent (*Oxfeld, Cohen & Blunda,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

The central issue in this appeal concerns the point at which a party may seek to be relieved of a contractual agreement to grieve a dispute over the terms and conditions of public employment and pursue a claim for relief in a court of law. The case arises in the context of a university professor challenging the legality and fairness of a tenure-retention decision. The teacher asserts that recourse to the grievance provisions of her contract would be futile so as to warrant the fashioning of a judicial remedy directing the method in which the university should evaluate her qualifications for tenure. We find that her judicial challenge to the university's method of determining tenure is premature and does not demonstrate the futility of the contractual grievance process.

I.

Dr. Ann Barr Snitow has been an assistant professor of English at Rutgers University for many years. In accordance with the University's procedures, she was to be considered for

reappointment and promotion in the Fall of 1981. That reappointment would have brought with it tenure.

The promotion and tenure process at Rutgers consists of evaluations by various committees and university officials. The process is multi-leveled and requires the review to commence with a recommendation by the tenured faculty at or above the proposed rank in the candidate's department, including the views of the department chair. The recommendation is forwarded to the dean of the college (here the School of Arts and Sciences). That dean consults with and receives the recommendation of that college's Appointments and Promotions Committee. When the evaluation is completed, the dean forwards the packet to the Office of the Provost or the Executive Vice President of the University, whichever applies, at which point a university-wide "appropriate peer group" of the Section (here the English Department) evaluates the candidate's credentials and submits its recommendation to the Office of the Executive Vice President. These materials are then furnished to the Promotion Review Committee, which is appointed by the President of the University to consider such personnel actions. This body (referred to as the "Summit") submits recommendations to the President. After considering all of the evidence from these various sources, the President makes a final recommendation to the Board of Governors of the University.

In the Fall of 1981, respondent was considered for promotion to the rank of Associate Professor and to be awarded tenure in accordance with these procedures. The English Department, the Dean of the Faculty of Arts and Sciences, and the English Section recommended Professor Snitow for promotion with tenure. The Committee on Appointments and the University's Promotion Review Committee, however, recommended against promotion and tenure.

Upon notification of the adverse decisions, Professor Snitow filed a grievance against the decisions of the latter two committees. The agreement between Rutgers University and the

Rutgers Council of the American Association of University Professors Chapters (hereinafter the "Agreement") provides a procedure to resolve disputes that arise in the course of the administration of this progressive evaluation toward teacher tenure.

In her grievance proceeding plaintiff alleged various discrepancies. The first concerned an early article of hers included in her promotion package; she contended that this article did not reflect her more recent interests and abilities and should not have been included in the package. The Grievance Committee agreed with her on this point and found that the Department had caused her to be harmed by its careless method in assembling the promotion package. In addition, Professor Snitow alleged that the Appointments and Promotions Committee had destroyed all notes and records of its deliberations and otherwise had acted arbitrarily in handling her matter. Finally, and most importantly for this disposition, she alleged prejudice on the part of a member of the Promotion Review Committee. This prejudice was allegedly based on an earlier article of the member espousing the view that a program of women's studies did not belong in the organization and aims of an English department. Dr. Snitow, the Grievance Committee found, had an "active commitment * * * to * * * 'Women's Studies.'" The Committee accepted plaintiff's allegations that the professor's article evidenced a frame of mind that is prejudiced towards women's studies; on that basis the Committee found evidence of prejudice on the part of the professor as well as the Promotion Review Committee because of the professor's failure to recuse himself from its deliberation.[1] In its conclusion, the

---

[1]The collective-negotiations agreement authorizes the Grievance Committee to remand a tenure decision "based on *personal* prejudice against the grievant." (emphasis supplied). Rutgers, for the first time here, argues that "personal prejudice" does not encompass an academic viewpoint opposed to that of the grievant and further contends that deeming the professor in question to be prejudiced violates notions of academic freedom. Rutgers claimed that the Grievance Committee acted beyond the scope of its authority in finding the

Grievance Committee sustained the allegations of arbitrary conduct on the part of the Promotion Review Committee. Its conclusion recited:

The Committee directs that the case be remanded to the Department as prescribed in the AAUP-Rutgers University Contract for a fresh promotion review process and that the new review be conducted (a) with an A & P committee made up of faculty members who did not participate in the review leading to this grievance[,] and (b) with voting members of the PRC different from those who took part in the review leading to the grievance.

The Grievance Committee's Report and Recommendations were rendered on June 13, 1983.

On August 24, 1983, Rutgers informed Professor Snitow that appropriate instructions would be provided to all applicable levels of review and the Dean would be directed to remove from the Appointments and Promotions Committee any member who previously reviewed her promotion packet. In addition, she was advised that if this review were positive her promotion and tenure would be effective retroactively to July 1, 1982. Thereafter, the University undertook the reprocessing of Professor Snitow's promotion application, resubmitting her promotion packet to the Department of English. The department then recommended plaintiff only by a tie vote. She was aggrieved because the individual professor specifically identified as demonstrating prejudice participated in the deliberations of the English Department and opposed her application.

Notwithstanding that this is but the first of the several steps in the review process, the plaintiff filed this complaint in the Superior Court on November 28, 1983. Professor Snitow's complaint stated that she

had neither anticipated nor expected that defendant University would permit [the tainted professor] to participate in any further consideration of her candidacy. Plaintiff had originally suggested to the University that a more appropriate resolution would be a reference to an "ad-hoc" committee of outside scholars of repute and authority in plaintiff's specialty and discipline.

---

professor in question to be prejudiced. Because this issue was not raised below, as part of a cross-claim or separate suit by Rutgers against the Grievance Committee, we do not address the issue.

In her complaint, plaintiff also alleged that it would be impossible to undo the damage done by this latest violation of her rights. She asked the court to set aside the determination of the English Department and direct "a remand to an ad-hoc committee to consider plaintiff's reappointment and promotion." The record is somewhat difficult to trace thereafter because Professor Snitow's case was consolidated for argument and disposition with the claim of another university professor and there were the inevitable cross-references between the two cases in the course of the colloquy between court and counsel. In its summary disposition of this matter, the trial court ordered that

the parties are directed to attempt to agree on an *ad hoc* committee selected from within the appropriate personnel of Rutgers University to make a recommendation for promotion and reappointment which recommendation shall be in lieu of any recommendation heretofore made by any individual or group identified as prejudiced or tainted by the report of the grievance committee.

On appeal, the Appellate Division, in an unreported opinion, affirmed the decision of the trial court except to modify it to provide that the mandated *ad hoc* committee would function only at the department, the Appointments and Promotions Committee, and the Promotion Review Committee levels. What this effectively means is that in addition to the *ad hoc* committee, only the Section and the offices of the Dean and the Executive Vice President would continue to be involved in developing a recommendation for the University President and the Board of Governors. We granted the University's petition for certification to review this decision. 101 *N.J.* 288 (1985).

## II.

Because of the disposition we make, we do not address the issues of academic freedom that are implicated by a court's substitution of its judgment for that of a teaching university as to the university's method of evaluating tenure. "[I]n a university setting, especially where questions of faculty tenure are

involved, [it is] a court's duty to refrain from inadvertently setting up its own standard * * *." *Kumar v. Board of Trustees*, 774 *F*.2d 1, 15 (1st Cir.1985) (Campbell, C.J., concurring). The concept of "[a]cademic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Regents of the University of California v. Bakke*, 438 *U.S.* 265, 312, 98 *S.Ct.* 2733, 2760, 57 *L.Ed.*2d 750, 785 (1978) (Powell, J., announcing Court's judgment and expressing his views of case). " '[T]he four essential freedoms' of a university" have been said to include the freedom "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy v. New Hampshire*, 354 *U.S.* 234, 263, 77 *S.Ct.* 1203, 1218, 1 *L.Ed.*2d 1311, 1332 (1957) (Frankfurter, J., concurring) (citation omitted). "Central to the determination of 'who may teach,' or who will receive tenure, has been the system of peer review by confidential evaluations and recommendations of tenured faculty." *E.E.O.C. v. Franklin and Marshall College*, 775 *F*.2d 110, 114 (3d Cir.1985). "[T]he peer review system has evolved as the most reliable method for assuring promotion of the candidates best qualified to serve the needs of the institution." *Johnson v. University of Pittsburgh*, 435 *F.Supp.* 1328, 1346 (W.D.Pa. 1977) (citation omitted) (*quoted in Kunda v. Muhlenberg College*, 621 *F*.2d 532, 548 (3d Cir.1980)).

The essential concern for not displacing the peer-review process with judicially-mandated *ad hoc* committees stems from the nature of the university. A university's system of faculty control over educational policies is partially rooted in

the medieval model of collegial decisionmaking in which guilds of scholars were responsible only to themselves. * * * At early universities, the faculty were the school. Although faculties have been subject to external control in the United States since colonial times, * * * traditions of collegiality continue to play a significant role at many universities * * *. [*NLRB v. Yeshiva University*, 444 *U.S.* 672, 680, 100 *S.Ct.* 856, 861, 63 *L.Ed.*2d 115, 124 (1980) (citations omitted).]

No decision can more fully implicate an institution's academic responsibility than the decision to hire, promote, and retain teaching faculty.

 Conversely, we can recognize the understandable grievance of a scholar who has worked as long and hard as this professor in a chosen field of study, asserting that she has been encouraged by the university to engage actively in the very field of study that is now said to impede her scholarly acceptance. This is precisely, however, the kind of dispute that courts should hesitate to resolve when the parties themselves have established the procedures to aid in its resolution. It is difficult to conceive of a collective-negotiations agreement in which the parties bring more sophisticated skills to the table.

The Agreement provides as follows:

X—FACULTY PERSONNEL GRIEVANCE PROCEDURE

I. *Definitions of a Grievance and Grievant*

A. A grievance under Article X is an allegation that in the evaluation of the grievant for reappointment, promotion and/or tenure, a University Regulation, an established practice or a provision of this Agreement was violated in the failure to award reappointment, promotion and/or tenure to the grievant. An established practice within the meaning of this Article is one which is not inconsistent with either a University Regulation or a provision of this Agreement. A University Regulation, an established practice or a provision of this Agreement is violated within the meaning of this Article when the action taken pursuant to the University Regulation, the established practice or the provision of this Agreement is arbitrary or capricious and/or is based on personal prejudice against the grievant.

When such a grievance exists, the Agreement provides the procedure for presenting the matter to a Grievance Committee. The functions and authority of that Committee are defined in Article X and specifically include the power to order a remand to correct the defect. The nub of the question is whether a dispute over the procedure on the second go-around is again mandatorily subject to the grievance procedure. Surely, a contention by a grievant that the remedy fashioned by Rutgers did not correct the defect that prompted the remand would be cognizable as an Article X grievance. The trial court recognized this but considered it futile to exhaust the grievance procedures and stated in its oral colloquy:

> You know you'll have to get on and end this matter because, as long as Dr. So and So sits on that committee there's going to be bias[ ], and that's what the Grievance Committee is going to find.

That may well be so, and if done, it will surely reinforce plaintiff's eventual claim should resort to judicial vindication become necessary at a later date. For while the substantive criteria for determining tenure status are not negotiable in this public-university setting, the parties may negotiate the procedural process to be followed in making such a decision. *Council of New Jersey State College Locals v. State Bd. of Higher Educ.*, 91 *N.J.* 18, 32 (1982). To the extent that the Agreement or its implementation deals with such procedural process, it is enforceable.

■ Ordinarily, a faculty member may be barred from seeking judicial review of internal university decisions due to a failure to exhaust administrative remedies. *See Gertler v. Goodgold*, 107 *A.D.*2d 481, 488, 487 *N.Y.S.*2d 565, 571 (1985); *see also Tiernan v. Trustees of Cal. State Univ.*, 33 *Cal.*3d 211, 215–18, 655 *P.*2d 317, 320–21, 188 *Cal.Rptr.* 115, 118–19 (1982) (plaintiff failed to demonstrate that claim fell within exception to exhaustion of remedies doctrine; therefore, consideration of claim barred); *Black v. University of Iowa*, 362 *N.W.*2d 459, 464 (Iowa 1985) (section 17A.19(1) of Iowa administrative procedure act provides that a person "who has exhausted all adequate administrative remedies * * * is entitled to judicial review * * * "). New Jersey's law applicable to public universities is consonant. The New Jersey Employer-Employee Relations Act, *N.J.S.A.* 34:13A–5.1 to –21, provides that "[g]rievance and disciplinary review procedures established by agreement between the public employer and the representative organization shall be utilized for any dispute covered by the terms of such agreement." *N.J.S.A.* 34:13A–5.3; *see also Saginario v. Attorney General*, 87 *N.J.* 480, 491 (1981) (section 34:13A–5.3 "mandates the use of the grievance procedures established by the collective negotiation agreement * * * ").

The prediction of the futility of the grievance process may be premature. While the trial court mandate was pending, the University offered to remove the tainted professor from the department and section levels; that the Appointments and Promotion Committee would be composed of members entirely different from the members who originally evaluated Dr. Snitow; that the Dean would be different; and, finally, that the Promotion Review Committee would not be the same Promotion Review Committee that originally evaluated Dr. Snitow.

Plaintiff's attorney rejected that offer and has taken the position that the sole evaluation and recommendation to the University's Board of Governors be made by a three- or five-person *ad hoc* committee. The attorney insists that no peer members of plaintiff's Department can participate. The University believes that where a candidate is being considered for tenure, the Board of Governors cannot be expected to act without the recommendation of the candidate's faculty peers and the institution's academic officers. These are issues uniquely within the expertise of the grievance committee chosen by the parties to aid in resolving such disputes.

We regret the long delay between this evaluation, which commenced in 1981, and today's decision. It is a process that invariably involves the most solemn educational actions of a university. Judicial intervention has not hastened the process. We are hopeful that plaintiff's review will be swiftly resolved at the university level.

The judgment of the Appellate Division is reversed and the order of the trial court is vacated.

*For reversal* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance* —None.