294 N.J. Super. 336 (1996)
683 A.2d 558
ARTHUR R. PELULLO, PLAINTIFF-APPELLANT,
v.
STATE OF NEW JERSEY COMMISSION OF INVESTIGATION AND LESLIE Z. CELENTANO, CHAIR, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 9, 1996.
Decided October 21, 1996.
*338 Before Judges SHEBELL, P.G. LEVY and BRAITHWAITE.
J. Michael Farrell argued the cause for plaintiff-appellant.
Robert J. Clark, Deputy Director, argued the cause for respondents, State Commission of Investigation and Leslie Z. Celentano (James J. Morley, Executive Director; Mr. Clark, of counsel, and on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
*339 Plaintiff, Arthur R. Pelullo, appeals from the January 5, 1996 entry of summary judgment in favor of defendants, New Jersey Commission of Investigation and its Chair, Leslie Z. Celentano. We affirm.
On June 29, 1995, the State Commission of Investigation (SCI) issued a report entitled "Organized Crime in Bars, Part II." The relevant information contained in the report was supplied by Philip Leonetti, nephew of Nicodemo Scarfo, who had previously become a witness for Federal and State authorities. The report, in pertinent part, stated (1) that plaintiff owned the Mars Restaurant which served as a meeting place for Scarfo Family members and family associates; (2) that plaintiff and the Mars Restaurant played roles in the Scarfo Family's dealings with the then Atlantic City Mayor; (3) that plaintiff had attended a meeting, during which he had to apologize to the Mayor for threatening to kill him because the Mayor would not help plaintiff get a license for his limousine company to operate in Atlantic City; (4) that the Pelullo brothers were guests at Scarfo's Christmas parties and at his Fort Lauderdale house; and (5) that plaintiff's brother, Leonard, owed money to Scarfo, and that when he didn't pay, plaintiff offered to turn over ownership of the Mars Restaurant to pay off the debt.
On July 31, 1995, plaintiff filed a Complaint against the SCI and its Chair alleging that they violated plaintiff's State and Federal Constitutional right to reputation by publishing the report without affording plaintiff due process of law. Plaintiff further alleged the report was inconsistent with the SCI's statutory authority in that it made and publicized findings with respect to the guilt of specific individuals including the plaintiff. Plaintiff sought a judgment declaring that the SCI violated his Constitutional rights or that the publication was inconsistent with its statutory authority. He asked for an injunction compelling defendants to expunge from their records and publications all references to the plaintiff suggesting that he is engaged in criminal activity, or that he is associated with organized crime or organized crime figures, and to *340 notify those who have already received the report that plaintiff's name has been withdrawn. Plaintiff also asked for attorney's fees and costs pursuant to 42 U.S.C.A. § 1988.
Defendants did not file an answer, but moved to dismiss for failure to state a claim upon which relief could be granted and/or summary judgment. R. 4:6-2(e) and R. 4:46-1. Plaintiff cross-moved for summary judgment. After argument, the Law Division judge denied plaintiff's cross-motion and granted summary judgment in favor of defendants.
The present controversy developed in this way. By letter dated May 2, 1995, plaintiff was advised by the SCI that it was going to issue a report in which he would be mentioned in a critical context. Plaintiff was informed that it was the policy of the Commission that any person to be mentioned in a potentially critical context in a Commission report be given an opportunity to respond by filing a statement under oath for the SCI's consideration. Plaintiff was told he would have to notify the SCI of his intent to respond within five days of receipt of the letter.
On May 5, 1995, plaintiff's then counsel gave notice on plaintiff's behalf and asked to be advised "of the context in which Mr. Pelullo may be mentioned in the report." Counsel for the SCI contacted the attorney's office by telephone on May 8, 1995, and "explained ... the nature of the report and read verbatim the portions of the report pertaining to Mr. Pellullo." She also indicated that if plaintiff wanted to file a statement, he would have to do so, in the form of an affidavit, by May 12, 1995.
On May 17, 1995, plaintiff's attorney advised the SCI's counsel that plaintiff would be submitting a "two liner" affidavit denying any social or business relationship with Leonetti or Scarfo, although plaintiff would not deny specific allegations because he could not "really recall" any specifics. On May 18, 1995, the SCI received plaintiff's affidavit which stated:
I, Arthur R. Pelullo, of Voorhees, New Jersey, being duly sworn according to law, hereby depose and say that I have never had any business or financial relationship of any kind with Philip Leonetti.
*341 On June 8, 1995, the Commission's counsel contacted plaintiff's attorney and told him that the denial contained in plaintiff's affidavit may be included in the report and that, if it were included, the report would also refer to plaintiff's testimony before the SCI in 1985, regarding his business dealings with Leonetti. His attorney indicated he was not aware of plaintiff's prior testimony and would have to speak to him. On June 12, 1995, the SCI was advised that plaintiff's original affidavit would not be withdrawn.
On June 22, 1995, the SCI was informed by another attorney that he was replacing the plaintiff's former attorney. He requested a copy of Leonetti's statement, but the SCI's counsel advised him that he could not have access to internal documents. He then requested that he be able to revise plaintiff's affidavit, and was granted permission to submit a supplemental affidavit by June 23, 1995.
Plaintiff's attorney was further advised of the information that would be added to the report in light of plaintiff's earlier affidavit, as follows:
Arthur Pelullo, in an affidavit to the Commission, denied "any business or financial relationship of any kind with Philip Leonetti." On May 2, 1985, Arthur Pelullo testified before the Commission under a grant of immunity in connection with the Commission's investigation on boxing. He testified about two business dealings with Leonetti and also stated that he and his brother, Peter, attended Scarfo's 1984 Christmas party. The Commission's 1985 Report on Organized Crime in Boxing included a segment on Arthur Pelullo's involvement with organized crime. It is further noted that Leonetti testified at the 1992 federal prosecution of Robert F. Simone, Esq., and Anthony DiSalvo about the loanshark debt owed by Leonard Pelullo (another brother) and the involvement of Arthur and Peter in its repayment.... Both Peter and Arthur Pelullo attended Testa's wake in September 1984. Finally, the 1990 annual report of the Pennsylvania Crime Commission profiled the organized crime involvement of Peter and Arthur Pelullo.
By letter dated June 26, 1995, as requested, the Commission report on Organized Crime in Boxing and the relevant portion of the 1990 report by the Pennsylvania Crime Commission, were sent to plaintiff's counsel. He was advised that he could withdraw plaintiff's affidavit or provide a supplemental affidavit. If neither action were taken by June 23, 1995, then the additional information *342 would appear in the report. On that date, the SCI received a "fax" from the attorney requesting the withdrawal of plaintiff's affidavit. The SCI, therefore, deleted from its report any reference to plaintiff's affidavit, his 1985 testimony before the SCI, the Commission's 1985 report on Organized Crime in Boxing, Leonetti's 1992 testimony, plaintiff's presence at Salvatore Testa's wake, and the 1990 annual report of the Pennsylvania Crime Commission.
On June 29, 1995, the SCI released the report, "Organized Crime in Bars, Part II," which, in reference to the plaintiff, contained the following regarding an apology for a threat:
On another occasion, Leonetti met with [former Atlantic City Mayor Michael] Matthews, [real estate developer and Scarfo Family associate Kenneth] Shapiro and a Scarfo Family associate named Arthur "Artie" Pelullo. Leonetti arranged for the meeting because he wanted Pelullo to apologize to Matthews for threatening him. During 1982 or 1983, when the Scarfo Family was involved with Matthews, Pelullo asked Matthews to help him get some type of license so that his limousine company could operate in Atlantic City. When Pelullo was having trouble getting the license, he threatened to kill Matthews, who contacted Leonetti for help. Leonetti set up a meeting at Shapiro's condominium to settle the matter and made Pelullo apologize to Matthews. Leonetti also met Matthews at the Mars Restaurant, a bar and restaurant owned by Pelullo on South Street in Philadelphia.
It also stated:
The Mars Restaurant, which was located at 712-714 South Street, was another location where Scarfo Family members and associates gathered for business and social purposes. It also served as a meeting place for Leonetti and then Atlantic City Mayor Michael J. Matthews. The Mars Restaurant was owned by Family associate Arthur Pelullo from April 1982 until 1986. The liquor license was held in the name of Caraway, Inc., which was owned by Carousel Group, Inc., in which Michael Vosbikian held 100% of the stock. Pelullo and Vosbikian were officers of Caraway and Vosbikian was the sole officer of Carousel. Following denial by Pennsylvania authorities of the application of Arthur Pelullo's brother, Leonard, to become sole officer of Caraway, Leonard's wife became its sole officer in 1986. The license was sold in December 1988. Leonetti related the following about the Mars Restaurant and the Pelullo brothers:
The Mars Restaurant was owned by Arthur "Artie" Pelullo, who was an associate of the Family and a New Jersey resident. Between approximately 1983 and early 1987, the Mars Restaurant, which was located on South Street near Eighth Street in Philadelphia, was a place where members and associates of the Family used to meet to discuss Family business and to socialize. Leonetti was at the restaurant on numerous occasions during that period and always ate and drank for free. Leonetti knew from his conversations with Pelullo at the restaurant that *343 he owned the Mars Restaurant. He did not know if any of Pelullo's relatives or anyone else had an ownership interest in the business or whose name was on the liquor license.
* * * *
Arthur Pelullo had two brothers, Peter and Leonard, who were also associates of the Family. Their uncle, Frank Nicoletti, was a La Cosa Nostra member in the Family. The Pelullo brothers were "with" Salvatore Testa until the time that Scarfo had Testa killed in September of 1984. After Testa's death, the Pelullo brothers were "with" Leonetti.
Arthur Pelullo and the Mars Restaurant played roles in the Scarfo Family's dealings with former Atlantic City Mayor Matthews:
During 1982 and 1983, Scarfo, Leonetti and others from the Family were involved in illegal activities with then Atlantic City Mayor Michael Matthews. During that priod [sic], Leonetti once had Arthur Pelullo meet with him and Matthews in Margate, N.J., to have Pelullo apologize to Matthews for threatening to kill him. Pelullo was angry because he didn't feel that Matthews was helping him enough to acquire an Atlantic City license for a limousine company Pelullo owned.
In 1983, during the period that the Family was involved with Mayor Matthews, Leonetti met Matthews once at the Mars Restaurant. Scarfo Family members Lawrence "Yogi" Merlino and Salvatore "Salvie" Testa were als [sic] present.
The Pelullo brothers were guests at Scarfo's Christmas parties and at his Fort Lauderdale house:
In December of 1984 and December of 1985, Scarfo held Christmas parties for members and associates of the Family at a restaurant known as LaCucina, which was located on South Street near Second Street in Philadelphia. The restaurant was owned by an associate of the Family named Salvatore "Sam the Barber" LaRussa. Only those approved by Scarfo or invited by him were allowed to attend. Arthur Pelullo attended both Christmas parties. Frank Nicoletti attended the 1985 party and Peter Pelullo attended at least one of the parties.
* * * *
In the summer of 1985, Scarfo bought a Fort Lauderdale, Florida, vacation home, which he, Leonetti and other Family members and associates visited periodically from the time that it was purchased until January of 1987, when Scarfo was arrested and held on extortion charges. During that period, Arthur, Leonard and Peter Pelullo all visited.
In 1985, the Mars Restaurant was offered in satisfaction of Leonard Pelullo's loanshark debt:
In December of 1985, Scarfo, Leonetti and Family associate and attorney Bobby Simone got involved in collecting a loanshark debt where the Mars Restaurant was offered as payment for the debt. Leonard Pelullo owed $200,000 to a Family associate and loanshark named Anthony "Tony" DiSalvo, who was having trouble getting Pelullo to repay the money. Scarfo and Leonetti met with Pelullo at *344 Scarfo's Florida house shortly after Christmas of 1985. Pelullo and Scarfo reached an agreement, which alled [sic] for Pelullo to pay $120,000 of the $200,000 debt. However, time passed without Pelullo paying off the debt. In approximately February of 1986, Leonetti met with Arthur Pelullo at the Mars Restaurant and informed him that his brother, Leonard, had not yet repaid the loan. Artur [sic] Pelullo told Leonetti that he would talk to his brother and attempt to get the money. He also offered the Mars Restaurant to Leonetti in settlemet [sic] of the debt, but Leonetti turned down the offer because considerable money was owed on it. Leonetti then wet [sic] to see Peter Pelullo, who helped in collcting [sic] the debt.
On this appeal, plaintiff essentially argues that summary judgment was not appropriate because defendants' action in publishing the report without first affording plaintiff meaningful notice and an opportunity to be heard violated his Federal and State Constitutional rights. He further urges that by publishing a report which accused the plaintiff of a specific criminal act, and detailing his alleged involvement with organized crime, the SCI exceeded the scope of authority conferred on it by the Legislature, thereby giving rise to a cause of action.
Plaintiff alleges that his "reputation" was harmed when the SCI published its report, based on information provided by Philip Leonetti, which indicated that plaintiff threatened the former Mayor of Atlantic City and had ties to organized crime. Plaintiff maintains he was denied his State and Federal Constitutional rights to due process and asserts that before the report was issued, he should have been given notice, provided with a copy of Leonetti's testimony or documentary evidence received implicating him, and an opportunity to be heard. Plaintiff also urges he was entitled to the opportunity to confront and cross-examine Leonetti and to use the subpoena power to compel the production of favorable witnesses or evidence on his behalf.
In Doe v. Poritz, 142 N.J. 1, 662 A.2d 367 (1995), our Supreme Court said:
The United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. Article I, paragraph 1 of the New Jersey Constitution does not enumerate the right to due process, but protects against injustice and, to that extent, protects "values like those encompassed by the principle[] of due process." Greenberg [v. Kimmelman], *345 supra, 99 N.J. [552] at 568, 494 A.2d 29 [294 (1985)]. In examining a procedural due process claim, we first assess whether a liberty or property interest has been interfered with by the State, and second, whether the procedures attendant upon that deprivation are constitutionally sufficient. Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir.1994) (quoting Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506, 514 (1989)).
[Id. at 99, 662 A.2d 367.]
Plaintiff asserts that the dissemination of the report impaired his reputation and violated his right to privacy.
Under the Federal Constitution, the right to privacy is among the protected interests entitled to due process. Id. at 100, 662 A.2d 367. However, in Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405, 414 (1976), the United States Supreme Court concluded that "reputation alone, apart from some more tangible interests such as employment, is [not] either `liberty' or `property' by itself sufficient to invoke the procedural protection of the Due Process Clause." Thus, while reputation alone is not sufficient to invoke the procedural protections of the Due Process Clause under the Federal Constitution, our State Supreme Court in Doe nonetheless concluded that, even for Federal Constitutional purposes, "[t]he harm to plaintiff's reputation, when coupled with the incursion of his right of privacy, although justified by the compelling state interest, constitutes a protectible interest." Doe, supra, 142 N.J. at 103, 662 A.2d 367. The Court in Doe, in what may well be termed dicta, further stated that under our State Constitution, "[o]ur analysis differs from that under the Federal Constitution only to the extent that we find a protectible interest in reputation without requiring any other tangible loss." Id. at 104, 662 A.2d 367.
Due process is not a fixed concept, but a flexible one that depends on the particular circumstances. Id. at 106, 662 A.2d 367 (citing Zinermon v. Burch, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100, 114-15 (1990)) (other citations omitted). "Fundamentally, due process requires an opportunity to be heard at a meaningful time and in a meaningful manner." Id. at 106, 662 A.2d 367 (citing Kahn v. U.S., 753 F.2d 1208, 1218 (3d Cir.1985)).
*346 Thus, the minimum requirements of due process are notice and the opportunity to be heard. Id. at 106, 662 A.2d 367 (citing U.S. v. Raffoul, 826 F.2d 218, 222 (3d Cir.1987)) (other citation omitted). To determine what procedural protections are required in a given case, the following factors must be weighed:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens the additional or substitute procedural requirement would entail.
[Id. at 106-07, 662 A.2d 367 (quoting Zinermon, supra, 494 U.S. at 127, 110 S.Ct. at 984, 108 L.Ed.2d at 115) (quoting Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)).]
The SCI has the duty and power to conduct investigations in connection with the faithful execution and effective enforcement of the laws of the State, with particular reference, but not limited to, organized crime and racketeering and also any matter concerning the public peace, public safety and public justice. N.J.S.A. 52:9M-2. It shall also conduct investigations and otherwise assist with the making of recommendations by the Governor to the Legislature with respect to changes in or additions to existing provisions of law required for the more effective enforcement of the law. N.J.S.A. 52:9M-3. Further, the SCI shall assist in connection with the Legislature's consideration of changes in or additions to existing provisions of law required for the more effective administration of the law. N.J.S.A. 52:9M-3.
N.J.S.A. 52:9M-10 provides:
The commission shall make an annual report to the Governor and Legislature which shall include its recommendations. The commission shall make such further interim reports to the Governor and Legislature, or either thereof, as it shall deem advisable, or as shall be required by the Governor or by concurrent resolution of the Legislature.
N.J.S.A. 52:9M-11 further provides:
By such means and to such extent as it shall deem appropriate, the commission shall keep the public informed as to the operations of organized crime, problems of criminal law enforcement in the State and other activities of the commission.
The SCI is not an "accusatory" body. Zicarelli v. New Jersey State Commission of Investigation, 55 N.J. 249, 258, 261 *347 A.2d 129 (1970), aff'd, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972). Rather, "the purpose of the SCI is `to find facts which may subsequently be used as the basis for legislative and executive action.'" Ibid. That the SCI "may also aid law enforcement by gathering evidence of crime and transmitting it to the appropriate agency for evaluation or prosecution does not militate against the power of the Legislature to seek the facts for its own purposes through such a commission." Id. at 261, 261 A.2d 129. Further, the Zicarelli Court made clear that in terms of "informing the public," this aspect of the statute mandated a general program of public education on "the state of affairs in a criminal area, to the end that helpful legislation may be proposed and receive needed public support." Id. at 260, 261 A.2d 129.
In the present case, the SCI did not, in publishing its report, make an accusation, or hand-down an adjudication that plaintiff was guilty of any crime. The report indicates only (1) that Leonetti stated that he set up a meeting for plaintiff to apologize to Mayor Matthews for threatening to kill him; (2) that the Mars Restaurant, which was owned by plaintiff, served as a place for social gathering and business meetings for Scarfo Family members and associates; (3) that plaintiff was "with" Leonetti; (4) that plaintiff attended Scarfo's Christmas parties and also went to his house in Fort Lauderdale; and (5) that plaintiff offered to give the Mars Restaurant to satisfy a loansharking debt incurred by plaintiff's brother.
Although the statement alleging that plaintiff had to apologize to Matthews for threatening to kill him referred to criminal conduct, this indirect report of the "threat" did not, as plaintiff contends, infer there was a finding that plaintiff was guilty of threatening the former Mayor. We do not perceive that the SCI put aside its investigative role in favor of an accusatory one when it reported on plaintiff's activities in this particular manner in its report. It did not act ultra vires its statutory authority.
The question then is whether defendant was given due process in the context of being mentioned in this manner in an *348 investigative report. Here, plaintiff received timely notice that he would be mentioned in a potentially critical context, pertinent excerpts of the report were read to his counsel, and he was given an opportunity to respond by sworn affidavit, which would have been included in the report. Defendants maintain that this "process" was sufficient, while plaintiff argues that he should have been afforded the full panoply of rights afforded one who has been criminally accused, before the report was published.
Because of a subsequent enactment establishing the limited procedural safeguards actually employed by the Commission in this case, we have the benefit of the Legislature's judgment on the value of greater safeguards when weighed against the fiscal and administrative burdens that the additional requirements sought by plaintiff would entail. See N.J.S.A. 52:9M-12.2. The Legislature, effective June 28, 1996, amended the SCI enabling act to provide:
a. Whenever a proposed State Commission of Investigation report is critical of a person's conduct, a copy of the relevant portions of the proposed report thereof shall be sent to that person prior to the release of the report. Upon receipt, the person criticized shall have 15 days to submit a written response of a reasonable length which the commission shall include in the report together with any relevant evidence submitted by that person.
b. Any report issued by the commission shall include any relevant evidence of a reasonable length concerning a person criticized in the report which is of an exculpatory nature or which tends to exonerate the criticized person.
c. A report issued by the commission shall include, upon request of the Attorney General, a statement indicating the results of any criminal prosecution or disciplinary action related to the report.
[N.J.S.A. 52:9M-12.2.]
Thus, even though the events in the present case preceded this enactment, the earlier policy of the SCI extended to plaintiff substantially the same safeguards.
In answering the question of the sufficiency of the process, we have noted that various factors must be considered: first, the privacy interest that will be affected by the official action; second, the likelihood of an erroneous deprivation of such interest through the procedures used, and the value, if any, of additional safeguards; and third, the Government's interest, comparing the function involved and the fiscal and administrative burdens the *349 additional procedural requirement would entail. Doe, supra, 142 N.J. at 106-07, 662 A.2d 367 (quoting Zinermon, supra, 494 U.S. at 127, 110 S.Ct. at 984, 108 L.Ed.2d at 115) (other citation omitted).
Regarding privacy, we consider whether and to what extent plaintiff has a reasonable expectation of privacy in the information disclosed. Id. at 78, 662 A.2d 367. If there is a reasonable expectation of privacy in the information disclosed, we then assess whether the intrusion on the right of privacy is justified by balancing the governmental interest in disclosure against the private interest in confidentiality. Ibid. If so, we still must examine the safeguards reasonably required to protect against error or too broad an intrusion.
Information readily available to the public, which an individual cannot expect to remain private, is generally not within the ambit of constitutional protection. Id. at 79, 662 A.2d 367 (citing Nilson v. Layton City, 45 F.3d 369, 372 (10th Cir.1995)). Likewise, "an individual cannot expect to have a constitutionally protected privacy interest in matters that are exposed to public view." Id. at 80, 662 A.2d 367 (citing Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967)). Here, aside from the threat to the former Mayor, the information in large measure was generally "exposed to public view." Further, plaintiff's 1985 testimony which indicated that he had business dealings with Leonetti revealed their connection.
Nonetheless, our Supreme Court, in Doe, suggested that a privacy interest may be implicated when the government assembles diverse pieces of information into a single package and disseminates that package to the public, thereby ensuring that a person cannot assume anonymity. Id. at 87, 662 A.2d 367. We, therefore, for present purposes accept the premise that a privacy interest was implicated, and move on to determinate whether the State's interest in disclosure outweighs plaintiff's privacy interest and whether the process afforded plaintiff was sufficient. Id. at 87-88, 662 A.2d 367. We are convinced that the nature of the *350 information disclosed, when balanced against the strong State interest in disclosure to inform the government and public as to organized criminal activity, entitles plaintiff only to reasonable protection against false and reckless information by means of procedural safeguards, without unduly impeding dissemination. See id. at 89-91, 662 A.2d 367.
As to due process, the court in Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) stated:
"Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used. Therefore, as a generalization, it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account.
[363 U.S. at 442, 80 S.Ct. at 1514-15, 4 L.Ed.2d at 1321.]
Further, the Hannah Court aptly noted:
[T]he investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings, and if persons who might be indirectly affected by an investigation were given an absolute right to cross-examine every witness called to testify. Fact-finding agencies without any power to adjudicate would be diverted from their legitimate duties and would be plagued by the injection of collateral issues that would make the investigation interminable. Even a person not called as a witness could demand the right to appear at the hearing, cross-examine any witness whose testimony or sworn affidavit allegedly defamed or incriminated him, and call an unlimited number of witnesses of his own selection. [footnote omitted]. This type of proceeding would make a shambles of the investigation and stifle the agency in its gathering of facts.
[Id. at 443-44, 80 S.Ct. at 1515, 4 L.Ed.2d at 1322.]
We are satisfied that the safeguards afforded plaintiff were sufficient. He was not denied due process given the investigative nature of the SCI and its report. He was dealt with fairly by the SCI. Plaintiff was told in the beginning of May that his name would be contained in the report. After approximately six weeks, *351 plaintiff's only submission to the SCI was a withdrawn affidavit which said that he did not have any relationship with Leonetti. There is no evidence that the report contained false information and that plaintiff was prevented from curing the error.
The holding in Simon v. Commonwealth of Pennsylvania, 659 A.2d 631, 634 (Pa.Cmwlth. 1995) is clearly distinguishable. There, the Pennsylvania court was confronted with a case wherein the Pennsylvania Crime Commission published a report entitled "Racketeering and Organized Crime in the Bingo Industry." In the report, the Commission made reference to both plaintiffs as being involved in the operation of bingo games and as being connected to organized crime figures. Ibid. Prior to the publication of the report, plaintiffs were denied both notice that their reputations were at issue and an opportunity to be heard.
Thus, the court in Simon held that the right to reputation was fundamental and that when viewed in conjunction with the nature of the right involved, the fact that the Commission was investigatory did not justify the abrogation of plaintiffs' right to possess and protect their reputations, without due process of law. Id. at 638-39. The Pennsylvania court correctly observed "[u]nder this scheme, there is no forum for an individual who believes that his reputation has been adversely affected to seek a remedy until after the possible damage has been done. This is clearly an unconscionable abrogation of a state protected constitutional right without due process." Id. at 639.
Here, the Commission only served an investigatory, not an accusatory or adjudicative function. The plaintiff will not be permitted to compel the full panoply of due process rights as this would be capable of impeding the investigative process. Plaintiff was given notice, his attorney was read the portions of the report that applied to him, and plaintiff was allowed to respond to the assertions by sworn affidavit. We conclude that our State or Federal Constitutions require no more and further, that our Legislature has determined that substantially the same process afforded here strikes a proper balance.
*352 We affirm the Law Division order granting summary judgment in favor of defendants.