54 A.3d 840

DAVID L. HAWK, PLAINTIFF–APPELLANT, v. NEW JERSEY IN-STITUTE OF TECHNOLOGY, ROBERT A. ALTENKIRCH, DON-ALD H. SEBASTIAN, AND ROBERT ENGLISH, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 1, 2012—Decided October 29, 2012.

Before Judges PARRILLO, FASCIALE and MAVEN.

*E. Daniel Larkin* of the Pennsylvania bar, admitted pro hac vice, argued the cause for appellant (*Andrew S. Bondarowicz* and *Mr. Larkin*, attorneys; *Mr. Bondarowicz*, of counsel; *Mr. Larkin*, on the brief).

*M. Trevor Lyons* argued the cause for respondents (*Connell Foley*, attorneys; *Tricia B. O'Reilly*, of counsel; *Ms. O'Reilly* and *Mr. Lyons*, on the brief).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

Plaintiff David L. Hawk, a tenured professor at the New Jersey Institute of Technology (NJIT), appeals from a final order of the General Equity Part, pursuant to *N.J.S.A.* 4:6–2(e), dismissing his August 22, 2011 amended complaint and accompanying motion for emergent relief against NJIT and three of its officers, seeking to enjoin currently pending "detenure" proceedings against him. For reasons that follow, we affirm.

The following facts are gleaned from the complaint and supporting documents. Plaintiff was first appointed to the NJIT faculty in September 1981 as an associate professor in the School of Architecture. In 1991, he was appointed to the faculty of the NJIT School of Management (SOM) with the rank of full professor, while still continuing to serve on the faculty at the School of Architecture. He later became Dean of the SOM in July 2006, a position he held until January 2008, though he remained a dual professor thereafter.

In early 2008, defendant Robert Altenkirch, president of NJIT, requested that the Director of University Audits, Alice Blount–Fenney, conduct an internal audit of the adequacy of internal controls over the SOM's financial transactions and operational activities. On October 28, 2008, Blount–Fenney issued an audit report finding that the overall management and internal controls

over SOM transactions were failing, and raised concerns that plaintiff may have committed ethics violations. That report led to additional investigations, including a focused audit of plaintiff's activities as SOM Dean by Blount–Fenney, an ethics investigation by NJIT's Ethics Liaison Officer, Jean Feeney, and an investigation by an ad hoc faculty committee.

Blount–Fenney's second audit report, issued June 30, 2009, found that plaintiff appeared to have been improperly reimbursed for a variety of reported expenses while SOM Dean. Defendant Donald Sebastian, then-Interim Provost at NJIT, met with plaintiff on July 1, 2009, to discuss the university's concerns over the preliminary evidence. According to plaintiff, however, Sebastian told him "as matters of determined fact" that he had violated the New Jersey Conflict of Interests Act, failed to exercise proper stewardship over university and State resources, and acted in other ways in contravention of his duties under State law and university policy. Plaintiff further claimed that although Sebastian said the evidence was sufficient to bring criminal charges against him, he could not inform plaintiff of the specific charges because they had not been "formalized" yet.

On July 14, 2009, NJIT's general counsel, Holly Stern, wrote plaintiff a letter describing the evidence against him and reiterating that it was sufficient to proceed with both an ethics investigation and a Faculty Council investigation. The letter identified the following issues:

One of the most significant issues brought to light surrounds the hiring, with tenure[,] of Dr. Annaleena Parkanhangas....

A preliminary inquiry reveals that you apparently knew Dr. Parkanhangas in a personal capacity a number of years prior to her candidacy for a position.... [A]t the time of hire, Dr. Parkanhangas listed her home residence at your home address of record. .. [T]his relationship ... would have minimally required that you make disclosure and recuse yourself from any involvement in consideration for her hire.... [Y]ou are reported to have taken an extremely active role in pressuring your colleagues and subordinates to secure a position for her and to squelch a genuinely open search process.

. . .

[I]t appears that you inappropriately directed that certain grades received by Marianne Kosits, a student of Professor Casals[,] be [change]d to an "A." .. This

change was done without the instructor's knowledge or consent, and he did not approve of same.

. . . .

[T]he audit of the [SOM] conducted at the direction of the Board of Trustees revealed a disregard for the stewardship of resources and public funds. There was little or no accountability for ensuring the payment of tuition; for accounting for receivables, for proper expense procedures, and for allowing family and friends to participate in overseas trips. Aside from fiscal imprudence, there is a pattern of abuse of your university position for undue advantage for yourself and others.

Because he did not hear from plaintiff following the July 14, 2009 letter, Sebastian sent him a letter on August 28, 2009, notifying him that he would be placed on administrative leave with full pay and benefits pending resolution of the investigations of the issues set out in Stern's letter. The letter further stated:

If you ... wish for the opportunity to be heard as to NJIT's decision to place you on administrative leave, please contact me at your earliest convenience, and we will take steps to address that request.

On March 10, 2010, Feeney (NJIT's Ethics Liaison Officer) interviewed plaintiff regarding the various allegations of misconduct. In a report issued on July 6, 2010, Feeney found that plaintiff had committed ethical violations related to grade changes of a student, the purchase and unknown whereabouts of university property, and the hiring of a professor. On July 13, 2010, the ad hoc faculty committee investigation similarly disclosed its findings that plaintiff had improperly authorized two grade changes for a student, after interviewing plaintiff about the allegations on May 24, 2010.

On August 23, 2010, NJIT President Altenkirch sent plaintiff a letter indicating that, based on the findings of the investigations and other information, the university would be instituting proceedings before the NJIT Board of Trustees under *N.J.S.A.* 18A:3B–6 to remove plaintiff from his tenured position. The letter also notified plaintiff that he would be suspended without pay as of September 3, 2010, for the same reasons. The letter further advised plaintiff that he could contest both the recommendation for removal and the suspension within ten business days, and any

review of the suspension would be made at the same time as the review of the underlying charges.

On April 7, 2011, the NJIT Board of Trustees passed a resolution to initiate the hearing phase of the detenuring proceeding. Plaintiff was at the meeting, addressed the Board, and provided the Trustees with printed materials.

While the detenuring proceeding was still underway, on August 24, 2011, plaintiff filed the instant complaint in the General Equity Part, seeking to enjoin the administrative process, alleging that the procedures employed by defendants in investigating the charges violated his procedural due process rights under the New Jersey Constitution, *N.J. Const.* art. 1, ¶ 1, and the common law doctrine of fundamental fairness.[1] Specifically, plaintiff's complaint alleged that defendants: (1) did not provide fair notice to plaintiff identifying his conduct that allegedly violated New Jersey law and university policy, nor did they provide evidence of such conduct; (2) did not give plaintiff a fair and timely opportunity to respond to defendants' charges against him; (3) have not provided a fair and timely adjudication of the charges; (4) have destroyed or ignored exculpatory evidence; and (5) have relied on allegedly incriminating evidence with indifference to the facially evident or readily determinable falseness of such evidence. As is apparent, these allegations all relate to the investigatory phase of the administrative proceedings against plaintiff.

As noted, plaintiff moved for an interlocutory injunction and defendants cross-moved to dismiss plaintiff's complaint under *Rule* 4:6–2(e) for failure to state a claim upon which relief could be

---

[1] Plaintiff's initial complaint, filed November 3, 2010, asserted identical claims, but under the federal due process clause and 42 *U.S.C.A.* § 1983, prompting defendants to remove the action to federal court, where, on June 14, 2011, the matter was dismissed under the *Younger* doctrine. *Younger v. Harris*, 401 *U.S.* 37, 91 *S.Ct.* 746, 27 *L.Ed.*2d 669 (1971). The United States Court of Appeals for the Third Circuit dismissed plaintiff's appeal of the district court judgment on November 15, 2011. *Hawk v. N.J. Inst. of Tech.*, No. 11–3869 (3rd Cir. Nov. 15, 2011).

granted. The trial judge granted defendants' motion, holding that plaintiff had failed to exhaust his administrative remedies and that, pursuant to the Higher Education Restructuring Act (HERA), *N.J.S.A.* 18A:3B–1 to –69, NJIT had primary jurisdiction over the dispute. The court also stated that plaintiff should raise any issues or concerns about NJIT's investigation before the hearing officer or, after a final decision is rendered by the Board, before this court on appeal.

On appeal, plaintiff does not challenge NJIT's authority to determine whether he should be removed from tenured employment. Instead, plaintiff essentially argues that the procedures used by defendants in their investigation of his conduct deprived him of protectible property and liberty interests without affording him procedural due process in violation of state constitutional law and the doctrine of fundamental fairness.

At the outset, we note that plaintiff's concession is entirely proper. As the General Equity judge correctly noted, HERA gives public institutions of higher education "final authority to determine controversies and disputes concerning tenure." *N.J.S.A.* 18A:3B–6(f). "The final administrative decision of a governing board of a public institution of higher education is appealable to the Superior Court, Appellate Division." *Ibid.*

 The doctrine of exhaustion of administrative remedies applies when "a claim is cognizable in the first instance by an administrative agency alone." *Boss v. Rockland Electric Co.,* 95 *N.J.* 33, 40, 468 *A.*2d 1055 (1983) (quoting *United States v. W. Pac. R.R.,* 352 *U.S.* 59, 63, 77 *S.Ct.* 161, 165, 1 *L.Ed.*2d 126, 132 (1956)). In making its decision, a trial court should consider whether invoking the rule would (1) ensure that "claims will be heard, as a preliminary matter, by a body possessing expertise in the area"; (2) "allow[ ] the parties to create a factual record necessary for meaningful appellate review"; and (3) result in an "agency decision [that] may satisfy the parties and thus obviate resort to the courts." *City of Atl. City v. Laezza,* 80 *N.J.* 255, 265, 403 *A.*2d 465 (1979).

The exhaustion doctrine is not "absolute" and a "trial court's determination whether to invoke those principles is a discretionary one." *Alliance for Disabled in Action, Inc. v. Cont'l. Props.*, 371 *N.J.Super.* 398, 408, 853 *A.2d* 328 (App.Div.2004); *see also Boldt v. Correspondence Mgmt., Inc.*, 320 *N.J.Super.* 74, 82, 726 *A.2d* 975 (App.Div.1999). Indeed, the exhaustion requirement may not apply when the administrative remedies would be futile or when irreparable harm would result. *Garrow v. Elizabeth Gen., Hosp. & Dispensary*, 79 *N.J.* 549, 561, 401 *A.2d* 533 (1979). As to the latter, "[t]he assertion of a constitutional right may be one factor to be considered in determining whether judicial intervention is justified"; however, it is only one of many relevant considerations. *Ibid.*

By the same token, a bald allegation that a constitutional right is involved or a blanket challenge to the validity of an agency's procedures does not relieve a plaintiff of the exhaustion requirement. *Brunetti v. Borough of New Milford*, 68 *N.J.* 576, 590–91, 350 *A.2d* 19 (1975). Rather, a "plaintiff must demonstrate not only that the constitutional question is colorable, but that the matter contains no factual questions which require administrative determination." *Ibid.* Even then, before permitting judicial intervention, a court should "weigh and consider the offsetting factors of orderly procedure, elimination of unnecessary judicial proceedings, and due deference to the expertise of" the agency in view of the broad discretion vested therein in such matters. *Garrow, supra*, 79 *N.J.* at 563, 401 *A.2d* 533. And even where an agency may lack proper jurisdiction to decide constitutional claims, relief from the exhaustion requirement may still not be warranted because "such issues [may] merely be noted, as is generally done in the municipal court. . . . In this way both the integrity of the administrative system and the defendant's right to a judicial determination of constitutional issues will be preserved." *Paterson Redevelopment Agency v. Schulman*, 78 *N.J.* 378, 396 *A.2d* 573, *cert. denied*, 444 *U.S.* 900, 100 *S.Ct.* 210, 62 *L.Ed.2d* 136 (1979).

██ Here, plaintiff argues that the constitutional dimension of his complaint, namely, the deprivation of procedural due process in the investigatory stages of the university's proceeding against him, somehow excuses his failure to exhaust his administrative remedies. Yet he has demonstrated none of the prerequisites for relief from the doctrine.

In *Garrow, supra,* a doctor attempted to enjoin a hospital from conducting a hearing on his application for membership on the hospital staff until the hospital complied with certain procedures. 79 *N.J.* at 552–53, 401 *A.*2d 533. The Court rejected the Appellate Division's conclusion that "plaintiff's claims for discovery prior to the hearing and presence of counsel implicated 'traditional concepts of fundamental procedural due process' to such an extent that judicial intervention was warranted." *Id.* at 562, 401 *A.*2d 533.

In *Snitow v. Rutgers Univ.,* 103 *N.J.* 116, 510 *A.*2d 1118 (1986), the plaintiff, a professor, sought to bypass the defendant university's established grievance procedure, arguing that it would be futile because of bias on the part of the committee hearing the plaintiff's complaint. *Id.* at 119, 510 *A.*2d 1118. The Court declined plaintiff's request for judicial intervention, finding that "[t]he prediction of the futility of the grievance process may be premature." *Id.* at 125, 510 *A.*2d 1118.

So too here. While plaintiff has alleged several so-called deficiencies in NJIT's investigation of the charges against him, he has made no showing that the matter is incapable of being adjudicated in a fair, impartial and proper manner in the administrative forum. As the General Equity judge noted: "[a]ny contention that it would be futile for NJIT's [b]oard of [t]rustees to render a final decision is premature, especially given the numerous investigations NJIT has conducted regarding plaintiff's alleged misconduct." Indeed, we have been informed at oral argument that the administrative proceeding, presently in its forty-third day of hearing from thirty-three witness thus far, has offered plaintiff a forum in which to voice his complaints and concerns about defen-

dants' investigation to the end that a complete and proper factual record may be developed for our ultimate review. Simply put, plaintiff has failed to show that the conduct of the administrative proceedings to this point has been arbitrary or that he will not receive a fair hearing and resolution from the Board.

Nor has he demonstrated irreparable harm. To date, plaintiff remains a tenured employee of NJIT. Furthermore, his constitutional claim simply does not rise to such level to warrant interlocutory judicial interference. He readily acknowledges that the full panoply of procedural due process rights does not attend the administrative investigation stage. *See Pelullo v. State Comm'n. of Investigation,* 294 *N.J.Super.* 336, 350–51, 683 *A.*2d 558 (App.Div.1996), *certif. denied,* 149 *N.J.* 35, 692 *A.*2d 48 (1997). In *Pelullo,* the plaintiff bar owner alleged that a State agency violated his due process rights by publishing an investigative report associating him with organized crime without first providing him meaningful notice and an opportunity to be heard. *Id.* at 339–40, 683 *A.*2d 558. We disagreed and found that plaintiff received the process due to him under the circumstance: "[P]laintiff received timely notice that he would be mentioned in a potentially critical context, pertinent excerpts of the report were read to his counsel, and he was given an opportunity to respond by sworn affidavit, which would have been included in the report." *Id.* at 348, 683 *A.*2d 558. We rejected the plaintiff's contention that he should have received the "full panoply of rights afforded one who has been criminally accused, before the report was published." *Ibid.*

It is by now well-settled that procedural due process is not a "fixed concept," but "a flexible one that depends on the particular circumstances." *Doe v. Poritz,* 142 *N.J.* 1, 106, 662 *A.*2d 367 (1995). "Fundamentally, due process requires an opportunity to be heard at a meaningful time and in a meaningful manner. The minimum requirements of due process, therefore, are notice and the opportunity to be heard." *Ibid.* (internal citations omit-

ted). Courts weigh the following factors in determining what process is due in a particular case:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

[*Id.* at 106, 662 *A.*2d 367 (quoting *Mathews v. Eldridge,* 424 *U.S.* 319, 335, 96 *S.Ct.* 893, 903, 47 *L.Ed.*2d 18, 33 (1976)).]

On this score, we have already determined that "the 'due process' requirements which govern the proceedings of an agency that makes binding legal determinations directly affecting legal rights do not apply to agency proceedings which are purely investigatory in nature." *In re Allegations of Physical Abuse at Blackacre Acad. on 2/10/93,* 304 *N.J.Super.* 168, 182, 698 *A.*2d 1275 (App.Div.1997). There, a State agency sent an investigatory report to the Department of Education concerning allegations of child abuse at an academy. *Id.* at 173, 698 *A.*2d 1275. The agency did not send copies of the report to plaintiffs (the school and its owner), but did send them letters summarizing the results of the investigation. *Ibid.* The plaintiffs argued that the investigation was unfair because the agency failed to consider the bias of witnesses who supplied information, failed to interview witnesses who could have provided exculpatory evidence, and did not consider inconsistencies between reports of the agency's investigators and witness statements taken by local police. *Id.* at 175, 698 *A.*2d 1275. We found no due process violation, noting that the agency report did not purport to be an adjudication binding on the Department of Education, but was merely investigatory. *Id.* at 183–84, 698 *A.*2d 1275. The plaintiffs' licenses could not be revoked until an evidentiary hearing was conducted. *Id.* at 184, 698 *A.*2d 1275.

Even assuming here that plaintiff's suspension without pay is a protectible property or liberty interest worthy of some due process protection, plaintiff has made no showing of a deprivation thereof to warrant the injunctive relief he seeks. It appears

undisputed that plaintiff was in fact given multiple and detailed notices of the allegations against him as well as several opportunities to be heard. As noted, Sebastian met with plaintiff to discuss concerns over preliminary evidence suggestive of misconduct shortly after the release of the second audit report, and assured plaintiff that no final determinations had yet been made. About two weeks later, NJIT's general counsel sent plaintiff a letter explaining the evidence against him in considerable detail and notifying him that the evidence was sufficient to proceed to a formal investigation. The letter requested that plaintiff contact Sebastian again regarding the matter. When plaintiff failed to respond, Sebastian sent plaintiff another letter the next month notifying him of the charges and that he would be placed on administrative leave with full pay and benefits pending resolution of the matter. Plaintiff was also told that he could contact Sebastian if he wished to be heard regarding this decision. Thereafter, one of NJIT's investigators personally met with plaintiff in a transcribed meeting to further discuss the misconduct allegations under investigation.

Similarly, the ad hoc faculty committee interviewed plaintiff and received documentary evidence from him. After the investigations concluded, Altenkirch sent plaintiff a letter informing him of the result, namely that there was sufficient evidence to move forward with detenuring proceedings before the Board and further advising plaintiff that he was being suspended without pay. The letter also informed plaintiff that he had the right to contest both decisions within ten business days. Plaintiff was present, spoke, and provided documentary evidence at the meeting where the Board passed a resolution to initiate the hearing.

In sum, plaintiff has received ample notice and was afforded adequate opportunities to present his own evidence and argument prior to the administrative determination to proceed to a formal adjudication of the charge. In light of these procedural protections, his claim of a violation of fundamental fairness fares no better than his constitutional deprivation contention. Simply stat-

ed, plaintiff has proffered no reason—much less a compelling one—to excuse him from the requirement that he exhaust his statutorily-prescribed administrative remedies. By denying injunctive relief, the General Equity judge quite properly disallowed plaintiff from disrupting the heavily favored and legislatively authorized administrative process. *See Garrow, supra,* 79 *N.J.* at 560, 401 *A.*2d 533.

Affirmed.