IN THE MATTER OF SENIOR APPEALS EXAMINERS, DE-
PARTMENT OF LABOR AND INDUSTRY, STATE OF
NEW JERSEY, HAY REPORT APPEAL.

Argued February 7, 1972—Decided April 24, 1972.

*Mrs. Marilyn Loftus Schauer,* First Assistant Attorney General, argued for the Civil Service Commission (*Mr. George F. Kugler, Jr.,* Attorney General, attorney; *Mr. David S. Litwin,* Deputy Attorney General, of counsel and on the brief).

*Mr. William J. Walsh* argued for the Senior Appeals Examiners (*Messrs. Scott, Fox & Walsh,* attorneys).

The opinion of the Court was delivered by

JACOBS, J. The Civil Service Commission, acting on the recommendation of the Hay Appeals Board, determined that the compensation allocated to the title of Senior Appeals Examiner, Department of Labor and Industry, be increased by one range. Being dissatisfied with this determination and seeking an increase of more than one range, the Senior Appeals Examiners filed notice of appeal to the Appellate Division of the Superior Court. Thereafter the Attorney General, representing the Civil Service Commission, moved to dismiss the appeal and we certified, directing the parties to confine their briefs and argument to the single legal issue of appealability raised by the motion to dismiss.

Acting under statutory authority, the Director of the Division of Budget and Accounting in the Department of the Treasury, with the approval of the President of the Senate and the Speaker of the General Assembly, entered into a contract with the management consulting firm of Edward N. Hay and Associates to conduct a thorough study of wages, work productivity and working conditions in State employment with the end in view of providing the Governor and Legislature with standards and guidelines for use in the preparation of budgets and appropriation acts "that will permit fair treatment of State employees and permit the State to gain and maintain a competitive position in its recruitment and retention of employees." *L.* 1968, *c.* 304; *N. J. S. A.* 52:14–17.50. The study was duly conducted and the comprehensive Hay Report was issued in April 1970. Thereafter the Department of Civil Service made an independent review of the report and made numerous adjustments in its compensation plan. The plan as modified was formally presented to the Civil Service Commission and in July 1970 the Commission adopted it for all employees in the State classified civil service. At the same time it announced that

it would thereafter "promulgate an appeals procedure for hearing employees grievances arising from the approved State Compensation Plan based on the Modified Hay and Associates Report."

The procedure established by the Commission contemplated. that employees could appeal the salary ranges allocated to their class titles to an Appeals Board of three persons — "a Civil Service Department employee, the personnel officer of the department where the appellant is employed, and a third member who is knowledgeable about salary matters and understanding of State employees' salary needs and aspirations." It further contemplated that the Appeals Board would hold hearings and make recommendations to the Civil Service Commission for its ultimate determination. On July 13, 1970 the President of the Department of Civil Service advised all department heads that State employees could appeal to the Hay Appeals Board from the salary ranges assigned to their class titles, that the employee grievances could be discussed at hearings to be scheduled by the Board, that the Board would "submit its recommendations to the Civil Service Commission for approval, modification, or rejection" and that the employees involved would be given "written notice of the Commission's decision."

On July 17, 1970 the Governor addressed a letter to all State employees in which, after referring to the fact that the Legislature had appropriated $30,000,000 for salary increases (*L.* 1970, *c.* 96, *p.* 474), he pointed out that pursuant to the Modified Hay Report 36,000 employees had received increments in salary ranges, that less than 4,000 had remained in their old ranges, and that less than 600 were allocated to lower ranges. Those allocated to lower ranges did not suffer any actual reduction in compensation. Referring to the Hay Appeals Board the Governor noted that he would insist that the Board be "prompt, fair, and understanding in its review of every case." On October 5, 1970 the President of the Department of Civil Service advised all

department heads as to the procedure before the Hay Appeals Board. He noted that "the hearings will be of an informal nature and the proceedings will not be adversary," that the Board will make inquiries into the facts and "will make recommendations to the Civil Service Commission, which alone is empowered to make decisions on salary range allocations."

On October 15, 1970 the Civil Service Department's Deputy Chief Examiner and Secretary issued internal management procedural instructions with respect to the functioning of the Hay Appeals Board. He there outlined the appeals procedures and noted, *inter alia,* that the Board would make an attempt to review the title on the basis of (a) "information supplied by the appellant," (b) the "education experience requirements necessary for the position," (c) "the duties and responsibilities of the position," (d) "the individual expertise which each Board member brings to the Board," and (e) "information received from the Division of Classification State Service and the Division of Research and Planning." After pointing out that "recommendations regarding titles in one department, might have a 'ripple effect' on titles in other departments," he noted that the Board would meet after all single titles from all departments had been heard and that at that meeting the Board would review all recommendations and make "a final recommendation to the Civil Service Commission (as) to the appropriateness of the salary ranges assigned to each title that was appealed before it."

After all of the 673 hearings before the Board were concluded it made its recommendations and transmitted them to the Commission which adopted them as its own. In a release dated April 4, 1971 the Commission disclosed the following: "There were 850 job titles involved in the 5,791 individual appeals from the Modified Hay Report. Of the 850 titles, 127 were increased by one range; 31 were increased by two ranges; 7 were increased by three ranges; and there was one title with an increase of four ranges.

These job titles involved 1,538 appellants, but 2,313 employees serving in these titles will receive increases. In 687 titles, it was determined that no change was indicated."

The appeal of the Senior Appeals Examiners was heard by the Hay Appeals Board on December 11, 1970. The record of the hearing includes various documentary materials and oral statements submitted by the Examiners in support of their appeal and their request for a higher salary range. On March 25, 1971 the Appeals Board recommended that "the present salary range 33 assigned to the title of Senior Appeals Examiner, Labor & Industry be increased one range." At the same time the Board recommended "that the title of Appeals Examiner be increased one range to 31" and that the "three range differential should be maintained." On March 30, 1971 the Civil Service Commission approved the recommendation that the salary range of Senior Appeals Examiners be increased from 33 to 34; the salary scale of range 34 is $12,603–$16,383. Following some correspondence the Senior Appeals Examiners were advised by the Hay Appeals Board in a letter dated June 8, 1971 that the Civil Service Commission's decision regarding the allocation of the salary range for their title was "the final administrative decision" and that "any additional appeal would have to be made to the Superior Court (Appellate Division)."

The notice of appeal by the Senior Appeals Examiners to the Appellate Division set forth that it was from the Civil Service Commission's final decision transmitted by the letter dated June 8, 1971. Its filing was followed by the Attorney General's motion to dismiss as well as by a motion of the Senior Appeals Examiners for an order remanding the matter to the Civil Service Commission. No response to the motion for remand has been filed by the Attorney General but the parties have agreed that if the motion to dismiss is denied the Attorney General may then respond as within time. We certified the present matter only for the purpose of passing on the motion to dismiss and conse-

quently any subsequent proceedings with respect to the motion for remand, as well as with respect to the appeal itself, will be pursued in regular course in the Appellate Division rather than in this Court. *Cf. R.* 2:2–3; *R.* 2:5–5; 1 *New Jersey Practice* (Del Deo Third Ed. 1971) 507–13; 1A *New Jersey Practice, supra.* 33–40.

The item under attack by the appellants Senior Appeals Examiners is the determination by the respondent Civil Service Commission that the compensation allocated to their title shall be increased by only one range. That determination clearly constituted final action of a State administrative agency within the terms of *R.* 2:2–3 which explicitly provides that such action shall be reviewable as of right in the Appellate Division. The appellants acknowledge that the determination involved the exercise of high incidents of discretion and administrative expertise and that under our decisions review thereof is confined to the issue of arbitrariness or abuse; but they urge that under the decisions they are entitled to that limited measure of review and that accordingly the Attorney General's motion to dismiss their appeal should now be denied. See *N. J. Const., art.* VI, *sec. 5, para.* 4 (1947); *Monks v. N. J. State Parole Board,* 58 *N. J.* 238, 248 (1971); *United Hunters Assn. of N. J., Inc. v. Adams,* 36 *N. J.* 288, 292 (1962); *State v. Wingler,* 25 *N. J.* 161, 180 (1957).

The Attorney General does not question that final administrative determinations by State agencies such as the Civil Service Commission are generally reviewable for arbitrariness or abuse of discretion (see *Flanagan v. Civil Service Department,* 29 *N. J.* 1, 9 (1959); *Carls v. Civil Service Commission of N. J.,* 17 *N. J.* 215, 221 (1955); *Falcey v. Civil Service Department,* 16 *N. J.* 117, 123 (1954)); but he urges that the administrative determination here comes within a special category beyond any judicial review. In support he asserts (1) that our statutes reveal a clear legislative intent to vest "final authority" over the adoption of the State compensation plan in the Civil Service Commis-

sion (*N. J. S. A.* 11:8–1, 2, 3; *N. J. S. A.* 11:5–1(b));
*Higgins v. Civil Service Commission,* 135 *N. J. L.* 238
(*Sup. Ct.* 1947 ), *aff'd,* 136 *N. J. L.* 636 (*E. & A.* 1948),
(2) that numerous practical considerations militate in the
same direction and indicate that the validity of the com-
pensation plan involves "issues which are not justiciable,"
and (3) that the Legislature has not recognized any "right"
to a fair wage subject to judicial review. *But cf. Bechler v.
Parsekian,* 36 *N. J.* 242, 256–257 (1961); *Davis, Adminis-
trative Law Treatise* (1970 *Supp.*) *pp.* 979–81; see *Sher-
bert v. Verner,* 374 *U. S.* 398, 404, 83 S. Ct. 1790, 10 *L.
Ed. 2d* 965, 971 (1963); *Shapiro v. Thompson,* 394 *U. S.*
618, 627, 89 S. Ct. 1322, 22 *L. Ed. 2d* 600, 611 (1969);
*Goldberg v. Kelly,* 397 *U. S.* 254, 262, 90 S. Ct. 1011, 25
*L. Ed. 2d* 287, 296 (1970); see also 4 *Davis, Administrative
Law Treatise* 1 *et seq.* (1958); *Jaffe, Judicial Control of
Administrative Action* 320 *et seq.* (1965); Berger, "Admin-
istrative Arbitrariness: A Synthesis," 78 *Yale L. J.* 965
(1969); Saferstein, "Nonreviewability: A Functional Analy-
sis of 'Committed to Agency Discretion,'" 82 *Harv. L.
Rev.* 367 (1968).

■ In New Jersey, judicial review of administrative
agency determinations has the support of a special consti-
tutional provision (*art.* VI, *sec.* 5, *para.* 4) which largely
immunizes it from legislative curbs. See *Fischer v. Twp. of
Bedminster,* 5 *N. J.* 534, 540 (1950); *cf. State, Dufford,
Pros. v. Decue,* 31 *N. J. L.* 302, 306–308 (*Sup. Ct.* 1865);
*Traphagen v. Township of West Hoboken,* 39 *N. J. L.* 232,
235–236 (*Sup. Ct.* 1877). And as Professor Jaffe has noted,
New Jersey "is conscious of itself as the jurisdiction in
which judicial review has been most freely available with
the least encumbrance of technical apparatus." *Jaffe, supra*
at 535; *Walker v. Stanhope,* 23 *N. J.* 657, 661 (1957);
*Garrou v. Teaneck Tryon Co.,* 11 *N. J.* 294, 302 (1953).
With the foregoing in mind, recent decisions in the federal
sphere, where Congress admittedly has much broader power
to preclude judicial review of agency determinations, may

be briefly reviewed here for the light they may shed on the points advanced by the Attorney General. See *Barlow v. Collins*, 397 *U. S.* 159, 90 S. Ct. 832, 25 *L. Ed. 2d* 192 (1970); *Association of Data Processing Service Organizations v. Camp*, 397 *U. S.* 150, 90 S. Ct. 827, 25 *L. Ed. 2d* 184 (1970); *Abbott Laboratories v. Gardner*, 387 *U. S.* 136, 87 S. Ct. 1507, 18 *L. Ed. 2d* 681 (1967); *cf. Cappadora v. Celebrezze*, 356 *F. 2d* 1 (2 *Cir.* 1966); *Wong Wing Hang v. Immigration and Naturalization Serv.*, 360 *F. 2d* 715 (2 *Cir.* 1966); see also *Aquavella v. Richardson*, 437 *F. 2d* 397 (2 *Cir.* 1971); *Northwest Residents Ass'n v. Department of H. & U. D.*, 325 *F. Supp.* 65 (*E. D. Wis.* 1971); *Burge v. Richardson*, 321 *F. Supp.* 646 (*N. D. Ga.* 1971).

In *Barlow*, tenant farmers eligible for payments under the upland cotton program enacted as part of the Food and Agriculture Act of 1965 instituted an action attacking regulations promulgated by the Secretary of Agriculture in 1966. The statute did not provide for judicial review and the Secretary contended that his action was not reviewable. In rejecting this contention the Court pointed out that a congressional intent to preclude judicial review was not to be lightly inferred, that reviewability was the rule, and that nonreviewability was "an exception which must be demonstrated." 397 *U. S.* at 166, 90 S. Ct. at 838, 25 *L. Ed. 2d* at 199. The Court quoted from *Abbott* where Justice Harlan, in an opinion sustaining the reviewability of Food and Drug regulations, noted that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." 387 *U. S.* at 140, 87 S. Ct. at 1511, 18 *L. Ed. 2d* at 686. In *Data Processing*, Justice Douglas, in an opinion upholding the reviewability of a ruling of the Comptroller of the Currency, pointed out that "there is no presumption against judicial review and in favor of administrative absolutism." 397 *U. S.* at 157, 90 S. Ct. at 831, 25 *L. Ed. 2d* at 190.

In *Cappadora* the Secretary of Health, Education and Welfare disallowed a claim for benefits under the Social Security Act. Years later there was an application to re-open the disallowance and in the exercise of his discretion the Secretary denied the application. An action seeking judicial review of the refusal to reopen was then brought. The Secretary contended that such review was not available but the court rejected this contention although it sustained his action on the merits. In the course of his opinion for the Second Circuit, Judge Friendly recognized a right to review for arbitrariness or abuse. He noted that, in the absence of evidence to the contrary, Congress may be presumed "to have intended that the courts should fulfill their traditional role of defining and maintaining the proper bounds of administrative discretion and safeguarding the rights of the individual." He considered that limited judicial review would not impose any heavy burden either on the agency or the courts and that in the "overwhelming bulk of cases" summary proceedings on the basis of the administrative record itself would be all that was needed. 356 *F. 2d* at 6; see also *Aquavella v. Richardson, supra,* 437 *F. 2d* at 401–404.

In *Wong Wing* the Second Circuit upheld the right to seek judicial review of the Board of Immigration's discretionary refusal to suspend an admittedly valid deportation order. Here again the review was confined to arbitrariness or abuse and the applicant failed to prevail on the merits. The court discussed various meanings which had been given in the cases to the phrase "abuse of discretion"; without essaying comprehensive definition it expressed the view that "the denial of suspension to an eligible alien would be an abuse of discretion if it were made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as an invidious discrimination against a particular race or group, or, in Judge Learned Hand's words, on other 'considerations that Congress could not have intended to make relevant.' *United*

*States ex rel. Kaloudis v. Shaughnessy,* [2 Cir.] *supra,* 180 *F. 2d* [489] at 491." 360 *F. 2d* at 719; see *Davis, supra* (1970 *Supp.*) at 978; 2 *Am. Jur. 2d, Administrative Law* § 651 (1962).

■ We come now to the Attorney General's first point under which he contends that the Legislature intended to vest in the Commission final discretionary authority not subject to judicial review. We may, for present purposes, bypass the issue of constitutional power for we find that in any event there was no such legislative intent. The Attorney General's reliance on *Higgins v. Civil Service Commission, supra,* 135 *N. J. L.* 238, is misplaced for there, unlike the case at hand, the Civil Service Commission did not exercise discretion but simply followed a legislative mandate which left it with no choice. In 1943 the Legislature appointed a commission to make a comprehensive study with a view towards adjustment of the compensation of State employees. *L.* 1943, *c.* 162. In due course the Commission submitted a report which embodied a classification and compensation plan. The Legislature directed that the Civil Service Commission adopt the reported plan. *L.* 1944, *c.* 65, *pp.* 128–29. The Civil Service Commission was given no discretion in that regard although it was expressly vested with power to "approve, modify or reject" subsequent classification and compensation plans. In *Higgins,* an employee who was allocated to the position of junior investigator in accordance with the plan was denied judicial relief in an opinion which pointed out that "since the Commission was obliged to adopt the classification report, and there is nothing to show that they did otherwise, the prosecutor is not entitled to anything more than he received." 135 *N. J. L.* at 239.

The Attorney General also places reliance on the present terms of *N. J. S. A.* 11:8–1, 2, 3 which, he contends, evidence a legislative intent to vest in the Commission final and completely unreviewable authority over State compensation plans. There is no express statutory language to that

effect nor is there any reason for implying it. *N. J. S. A.* 11:8–1 provides that the chief examiner and secretary shall submit annual compensation schedules to the Commission along with his recommendations. *N. J. S. A.* 11:8–2 provides that the compensation schedules mentioned in 11:8–1 along with any amendments and modifications, when approved by the Commission, shall constitute the compensation plan for the ensuing year "except as to any modification by legislative action." This quoted language, along with similar language in *N. J. S. A.* 11:8–3, simply refers to the comprehensive legislative power to deal with all matters affecting the compensation of State employees and the appropriations therefor. Surely it was not intended to have any relation to discretionary determinations by the Commission and their reviewability for arbitrariness and abuse under traditional judicial doctrines. *Cf. Barlow v. Collins, supra,* 397 *U. S.* 159, 90 S. Ct. 832, 25 *L. Ed. 2d* 192; *Association of Data Processing Service Organizations v. Camp, supra,* 397 *U. S.* 150, 90 S. Ct. 827, 25 *L. Ed. 2d* 184; *Abbott Laboratories v. Gardner, supra,* 387 *U. S.* 136, 87 S. Ct. 1507, 18 *L. Ed. 2d* 681.

Under his second point the Attorney General urges that the pertinent practical considerations militate here against judicial review. However, we fail to see how they may justly be invoked to preclude appellants from seeking relief on the basis of affirmative showings of administrative arbitrariness or abuse. We of course recognize that the adoption of the plan involved extensive administrative expertise and discretion and that, in considering alterations and modifications, the Commission had to bear in mind numerous pertinent factors, including the ripple effects and the over-all appropriation limitations. *Cf.* Saferstein, *supra,* 82 *Harv. L. Rev.* at 385. But while all this may bear on the unlikelihood of ultimate success, it cannot properly serve to exclude appellants at the threshold. In all fairness they must be given the opportunity to establish that there was administrative conduct which should be upset under the tradi-

tional proscriptions of arbitrariness and abuse. See *Cappadora v. Celebrezze, supra,* 356 *F.* 2d at 6; *Wong Wing Hang v. Immigration and Naturalization Serv., supra,* 360 *F.* 2d at 718–719; 2 *Am. Jur.* 2d*, supra* at 507–12.

The Attorney General suggests that even a limited right of judicial review will result in numerous appeals which may overwhelm both the Commission and the courts. We do not envision any such result but note that, in any event, we have not heretofore hesitated to act in the compelling interests of individual justice despite comparable prophecies of burdensome consequences. See *Carls v. Civil Service Commission of N. J., supra,* 17 *N. J.* 215; *State v. Wingler, supra,* 25 *N. J.* 161; *Monks v. N. J. State Parole Board, supra,* 58 *N. J.* 238; *cf. State v. Kunz,* 55 *N. J.* 128 (1969); *Crescent Pk. Tenants Assoc. v. Realty Eq. Corp. of N. Y.,* 58 *N. J.* 98 (1971). In *Carls,* the Civil Service Commission eliminated certain titles from the classification plan, added others, and reclassified the appellants. They attacked their reclassification as "arbitrary, capricious, discriminatory and void." We unhesitantly upheld their right to judicial review though we rejected their claim on the merits pointing out that "where the Commission reasonably exercises its statutory reclassification powers, courts should be careful not to interfere lest they usurp functions entrusted to other branches of government." 17 *N. J.* at 223. See *Rubright v. Civil Service Commission,* 137 *N. J. L.* 369, 373 *(Sup. Ct.* 1948); *Flanagan v. Civil Service Department, supra,* 29 *N. J.* at 9.

In *Wingler* a prisoner attacked his transfer from one State institution to another as an "abuse of discretion." We recognized that the statutory transfer power vested in the Commissioner of Institutions and Agencies was a highly discretionary one and that judicial review may entail practical difficulties. Nonetheless we explicitly upheld the right of review, pointing out that the Commissioner's authority was not unlimited and that its exercise would be upset on an affirmative showing of arbitrariness or abuse. 25 *N. J.*

at 180–181. In *Monks* the State Parole Board, acting in accordance with its then settled practice, rejected the appellant's request for a statement of its reasons for denying parole to him. On judicial review he obtained a direction that the Board grant his request; in addition and, notwithstanding its contention that the practicalities dictated continuance of its prior practice and complete administrative finality, the Board was in effect directed to adopt a suitable administrative rule "designed generally towards affording statements of reasons on parole denials." 58 *N. J.* at 249.

In the course of our opinion in *Monks* we pointed out that the Parole Board has "broad but not unlimited discretionary powers" and that under our special constitutional structure (*N. J. Const., art.* VI, *sec.* 5, *para.* 4 (1947)) its "actions are always judicially reviewable for arbitrariness." 58 *N. J.* at 242. And we took occasion to restate the historic nature of our jurisdiction over administrative agencies; since the statement there is equally pertinent here, it may appropriately be repeated:

Our judicial system has historically been vested with the comprehensive prerogative writ jurisdiction which it inherited from the King's Bench; that jurisdiction has been frequently exercised in the supervision of inferior governmental tribunals including administrative agencies. See the very early cases of *State v. Justices, &c., of Middlesex*, 1 N. J. L. *244 (Sup. Ct. 1794), where Chief Justice Kinsey described the jurisdiction "as unlimited and universal as injustice and wrong can be" (at *248), and *Ludlow v. Executors of Ludlow*, 4 N. J. L.*387 (Sup. Ct. 1817), where Chief Justice Kirkpatrick described it as "very high and transcendent" (at ˙389) ; and also the more recent cases of *Fischer v. Twp. of Bedminster*, 5 N. J. 534 (1950), where Justice Heher noted that the "inherent power of superintendence of inferior tribunals" (at 560) was secured by the 1844 Constitution and could not be impaired by the Legislature, and *McKenna v. N. J. Highway Authority, supra*, 19 N. J. 270, where Justice Burling noted that the prerogative writ jurisdiction included not only the review of "judicial actions" but also the superintendence of civil corporations, magistrates and "other public officers." (at 274). When our 1947 Constitution was prepared, pains were taken to insure not only that the court's prerogative writ jurisdiction would remain intact, but also that the manner of its exercise would be greatly simplified (art. VI, sec. 5, para. 4). See *Ward v. Keenan*, 3 N. J. 298. 303–308 (1949). The implementing court rules now provide an

easy mode of review designed to insure procedural fairness in the administrative process and to curb administrative abuses. See *In re Masiello*, 25 N. J. 590, 603 (1958) ; *Elizabeth Federal S. & L. Assn. v. Howell*, 24 N. J. 488, 499 (1957). 58 *N. J.* at 248–249.

■ Under his third and final point the Attorney General urges that the Legislature has not recognized any "right" to a fair wage subject to judicial review. This appears to place reliance on the right-privilege distinction which has been thoroughly undercut in recent cases. See *Sherbert v. Verner, supra,* 374 *U. S.* 398, 83 S. Ct. 1790, 10 *L. Ed. 2d* 965; *Shapiro v. Thompson, supra,* 394 *U. S.* 618, 89 S. Ct. 1322, 22 *L. Ed. 2d* 600; *Goldberg v. Kelly, supra,* 397 *U. S.* 254, 90 S. Ct. 1011, 25 *L. Ed. 2d* 287; *Bechler v. Parsekian, supra,* 36 *N. J.* 242; *Davis, supra* (1970 *Supp.*) at 979–981. In any event, it has no merit for the Legislature undoubtedly contemplated in its statutory delegations to the Civil Service Commission that the Commission would exercise its discretionary powers reasonably and with fair regard for the interests of the State employees whether those interests be viewed as rights or privileges. Indeed the very statute which authorized the Hay Report explicitly referred to the goal of "fair treatment" of State employees. *N. J. S. A.* 52 :14–17.50. And the discretionary authority vested by the Legislature in the Commission to "approve, modify or reject" (*N. J. S. A.* 11 :5–1; *N. J. S. A.* 11 :8–1 *et seq.*) the plan in the Hay Report carried with it the administrative responsibility of acting reasonably both procedurally and substantively.

In the light of the nature and magnitude of the undertaking, the procedures followed by the Commission may well have been generally fair; subject to any controlling statutory restrictions (*cf. N. J. S. A.* 52 :14B–1 *et seq.*) the Commission undoubtedly had broad power to mold its procedures in conformity with due process principles. See *Laba v. Newark Board of Education,* 23 *N. J.* 364, 382 (1957) ; *In re Shelton College,* 109 *N. J. Super.* 488, 492 (*App. Div.* 1970) ; *cf. Motyka et al. v. McCorkle et al.,* 58 *N. J.* 165, 180

(1971). Substantively, the Commission was called upon to give due consideration to numerous factors and here again its determinations may well have been generally reasonable and within its discretionary authority. But that does not mean that aggrieved individuals who assert, as here, that insofar as their particular situations were concerned the Commission acted arbitrarily or in abuse of its discretion, should be denied fair opportunity of making such a showing. On the contrary, justice clearly dictates that they be given that opportunity, along with any consequential judicial relief to which they may be entitled. Accordingly the respondent's motion to dismiss is:

Denied and the cause is remanded to the Appellate Division for further proceedings.

*For denial and remand*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*Opposed*—None.