698 A.2d 1275

IN RE: ALLEGATIONS OF PHYSICAL ABUSE AT BLACKACRE ACADEMY[1] ON 2/10/93, CONCERNING STUDENTS J.R., R.B., Q.G., L.H., B.J., E.L., P.M., B.M., D.M., J.P., T.Q., T.R., JOHN R., W.R. AND L.T.

Superior Court of New Jersey
Appellate Division

Argued November 7, 1996—Decided August 21, 1997.

---

[1] The appellants are referred to by fictitious names. See N.J.S.A. 9:6–8.10a, which provides that "[a]ll records of child abuse reports ..., all information obtained by the Division of Youth and Family Services in investigating such reports ..., and all reports of findings forwarded to the central registry ... shall be kept confidential," and N.J.S.A. 9:6–8.10a(b), which provides in pertinent part that "[a]ny ... court ... which receives from the division the records and reports referred to in subsection a., shall keep such records and reports, or parts thereof, confidential."

Before Judges SKILLMAN, A.A. RODRÍGUEZ and CUFF.

*Rebecca K. Spar* argued the cause for appellants John Doe and Blackacre Academy (*Cole, Schotz, Meisel, Forman & Leonard,* attorneys; *Ms. Spar* and *Thomas M. Ard,* on the brief).

*Beth A. Mattoon,* Deputy Attorney General, argued the cause for respondent Division of Youth and Family Services (*Peter Verniero,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Mattoon,* on the brief).

The opinion of the court was delivered by

SKILLMAN, J.A.D.

Blackacre Academy is a private day school for special education students who have exhibited behavioral problems, including physical and verbal abuse of other students and teachers, which make it difficult to educate them in a regular school environment. Dr. John Doe is the primary owner and the principal of Blackacre Academy. Students are placed in Blackacre Academy by local school districts pursuant to *N.J.S.A.* 18A:46–14(g) and *N.J.A.C.* 6:28–1.1 to –12.1, and the Department of Education licenses the school and conducts periodic reviews of its operations in accordance with *N.J.S.A.* 18A:46–15, *N.J.S.A.* 18A:69–1 to –6 and *N.J.A.C.* 6:28–5.2, *N.J.A.C.* 6:28–7.1 to –7.9 and *N.J.A.C.* 6:28–9.1 to –9.2.

On February 12, 1993, a social worker employed by Blackacre Academy called the "Child Abuse Control Hotline" of the Division of Youth and Family Services (DYFS) to report a violent incident which she had allegedly witnessed between Dr. Doe and J.R., who was one of the students at the school. On March 3, 1993, the same social worker furnished DYFS with the names of other students at Blackacre Academy who allegedly had been abused. On that same day, an assistant regional supervisor of the Institutional Abuse Investigation Unit (IAIU) of DYFS sent a letter to Dr. Doe, notifying him of the allegation of abuse of J.R. and indicating that an investigation was "on-going."

The IAIU subsequently notified the county prosecutor and the local police department of the allegations against Blackacre Academy and all three agencies initiated investigations, consisting primarily of interviews of students, parents, teachers and administrators. Although most of these interviews were conducted in the spring of 1993, the IAIU did not complete its evaluation of the results of the investigation until nearly a year later.[2]

---

[2] Insofar as the record before us indicates, the county prosecutor and the local police department never took any action with respect to the matter.

On April 13, 1994, the IAIU sent a document to the Department of Education, entitled "Institutional Abuse and Neglect Report," which concluded that the allegations of abuse with respect to J.R. had been "substantiated." The report also indicated that allegations of abuse with respect to other students were "unsubstantiated with concerns." The report identified as "other concerns" that "[Blackacre] Academy staff are lacking formal training in the areas of crisis management and passive restraints," that there are "frequent and lengthy suspensions of students" and that some "physical interventions" by one of the "crisis counselors" involved methods which were "potentially dangerous and involved some excessive force." The report concluded with a recommendation that the "Department of Education thoroughly evaluate the [Blackacre] Academy with regard to the various findings of this investigation and take such actions as necessary to address the concerns raised regarding Dr. [Doe's] actions, staff's actions, training, and suspensions."

Although the IAIU did not send copies of the Institutional Abuse and Neglect (IAN) Report to Dr. Doe or the parents of the students who were subjects of the report, it sent them letters which summarized the results of its investigation. The letter to J.R.'s mother stated in part:

> Physical abuse was substantiated related to staff's actions.... Other concerns were noted as a result of the investigation. As you are aware, [J.R.] sustained multiple superficial injuries as a result of this incident. Dr. [Doe's] actions were unjustified and inappropriate and placed [J.R.] at unnecessary and undue risk of serious harm.
>
> The New Jersey Department of Education has been notified of this finding.

The letter to the other parents whose children had been subjects of the IAIU investigation were similar, except that those letters stated that "[p]hysical and emotional abuse was unsubstantiated with concerns related to staff's action."

The letter to Dr. Doe, which was signed by the "Administrator" of the IAIU, stated in part:

> On 2/17/93, the Division's Institutional Abuse Investigation Unit ... received allegations of physical and emotional abuse at [Blackacre Academy].

> An investigation was conducted. Physical abuse was substantiated regarding your actions in accordance with the statutes of the State of New Jersey. Physical/emotional abuse was unsubstantiated with concerns regarding your actions relative to various other students.... Concerns were also noted regarding a pattern of frequent and lengthy suspensions of students, and it is a concern that [Blackacre] Academy staff are lacking formal training in the areas of crisis management and passive restraints. The New Jersey Department of Education, Office of Special Education Programs, has been notified of this finding.
>
> If you have questions regarding this finding, you may contact the Department of Education, Office of Special Education Programs.

The letter also noted that under *N.J.S.A.* 9:6–8.10a, "reports, records, and information concerning child abuse and neglect are confidential" and consequently that "[t]he materials and information contained therein may not be disclosed to the public or to the press either directly, or as part of any otherwise public records or proceedings." In addition, the letter stated:

> If you are dissatisfied with this decision regarding substantiated physical abuse, you have 45 days from the date that you receive the decision to seek judicial review. The court that reviews these decisions is the Appellate Division of the New Jersey Superior Court.

Blackacre Academy and Dr. Doe filed a notice of appeal to this court from the Administrator's letter.[3] We granted appellants' motion for a stay pending appeal, noting that DYFS had not opposed the motion. During the pendency of the appeal, appellants obtained copies of the Institutional Abuse and Neglect Report, with the names of certain witnesses redacted, and the letters to the parents, and some of appellants' arguments on appeal are based on these documents.

In their initial brief, appellants argued that the IAIU's investigatory findings were based on the statements of child witnesses, whose competency had not been established in conformity with the requirements set forth in *State v. R.W.*, 104 *N.J.* 14, 20, 514 *A*.2d 1287 (1986), and that those statements were the product of the same kinds of suggestive interrogation techniques condemned in

---

[3] The notice of appeal also names as an appellant Robert Doe, Dr. Doe's brother, who has a 1% ownership interest in Blackacre Academy. Robert Doe does not actively participate in the management of the school and is not mentioned in the IAIU's report to the Department of Education.

*State v. Michaels,* 136 *N.J.* 299, 309–18, 642 *A.2d* 1372 (1994). Appellants also argued that the IAIU's investigation had been unfair because the agency failed to conduct any inquiry into the alleged retaliatory motives of the former Blackacre Academy employees who furnished derogatory information regarding the school, failed to interview witnesses who could have provided exculpatory evidence, and failed to consider material inconsistencies between reports of IAIU investigators and members of the local police department regarding the statements of certain witnesses. In addition, appellants argued that because the IAIU had issued its report to the Department of Education without conducting an evidentiary hearing, this court should conduct a *de novo* review of the file developed in the investigation to determine whether the IAIU's findings "are supported by a preponderance of the competent and credible evidence." Moreover, appellants argued that the IAIU's investigatory finding that J.R. was abused and its expressions of "concern" regarding the treatment of other students are not supported by substantial credible evidence. Finally, appellants argued that the IAIU's finding that the allegations of abuse with respect to fourteen other students were "unsubstantiated with concerns" was *ultra vires.* Based on these alleged deficiencies in the IAIU's investigation and findings, appellants asked this court to enter an order "holding that the reports of abuse as to J.R. and the 14 other children are unsubstantiated and directing the Department of Education, Division of Special Education and Deputy Attorney General to destroy all copies of the IAN Report and any other communications from DYFS regarding this matter."

DYFS' primary response to these arguments was that the legal principles relied upon by appellants apply only to adjudicatory proceedings in which an administrative agency makes findings of fact and imposes "sanctions affecting employment or other property interests of the particular parties," and that the IAIU's role in this matter was "purely investigative." DYFS pointed out that the Department of Education has the exclusive authority to determine whether a private school such as Blackacre Academy has

violated the rules and regulations governing its operations and to order remedial action if a violation is found, and that the Department of Education would be required to conduct an evidentiary hearing before it could issue an order affecting Blackacre Academy's rights.

At oral argument, we directed the parties to file supplemental briefs dealing with the nature of the administrative action involved in the IAIU's issuance of the Institutional Abuse and Neglect Report, whether that report and the IAIU's letters to the Department of Education and the parents of the Blackacre Academy students mentioned in the report constitute final administrative action which is appealable as of right to this court, and if the IAIU's action is appealable, what standard of review applies.

Appellants filed a supplemental brief in which they argued that the IAIU's action was not purely investigatory because its report contains a determination that abuse occurred, which is placed in a "Central Registry" that is subject to searches by numerous entities, and its findings and recommendations were forwarded to the Department of Education, which has the authority to revoke appellants' licenses. Appellants also argued that DYFS violated the confidentiality mandate of *N.J.S.A.* 9:6–8.10a by notifying the Department of Education and other interested parties of the results of its investigation.

DYFS argued in its supplemental brief that the IAIU's role in this matter was essentially investigatory and that the only agency with the authority to revoke appellants' licenses or to order them to take remedial action is the Department of Education. DYFS acknowledged that its findings that the allegation of abuse as to J.R. had been "substantiated" may provide a basis for judicial review, because that finding is placed in DYFS' Central Registry, as required by *N.J.S.A.* 9:6–8.11. In addition, DYFS argued that it was statutorily authorized to notify the Department of Education and the parents of students concerning whom there had been allegations of abuse of the results of its investigation. However, DYFS urged that due to the limited impact of this adminis-

trative action, it "was not compelled to provide Appellants with broad based due process protection to challenge [the IAIU's] investigative findings." DYFS also urged that the scope of judicial review of those findings should be limited.

In view of the expansive power of the courts of this State to review administrative action, *see, e.g., In re Senior Appeals Examiners*, 60 *N.J.* 356, 362–66, 290 *A.*2d 129 (1972), we conclude that the IAIU's finding that the alleged abuse of J.R. was "substantiated" is subject to judicial review because it was placed in the Central Registry. Moreover, appellants' claim that the IAIU had no authority to disseminate the results of its investigation to the Department of Education and the parents of students mentioned in the report is clearly justiciable. We conclude for the reasons expressed in section I of this opinion that the IAIU had the statutory authority to report the results of its investigation to the Department of Education and the parents of the students mentioned in the report. We also conclude for the reasons expressed in section II that the IAIU was not required to conduct a formal or informal hearing before placing appellants' names in the Central Registry and disseminating the results of its investigation to the Department of Education and the parents. Finally, we conclude for the reasons expressed in section III that there is a sufficient factual foundation in the record before us to support the IAIU's investigatory finding that the allegation of abuse as to J.R., was substantiated. Accordingly, we affirm the IAIU's action.

I

Initially, we consider DYFS' statutory authority to investigate allegations of child abuse and report the results of an investigation to other government agencies and interested parties. *N.J.S.A.* 9:6–8.10 provides that "[a]ny person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse shall report the same immediately to [DYFS]." Upon receiving such a report, *N.J.S.A.* 9:6–8.11 requires DYFS to "immediately take such action as shall be necessary to insure the

safety of the child." *N.J.S.A.* 9:6–8.40 requires DYFS to conduct an investigation of any allegations of abuse or neglect, including abuse or neglect within an institution or school. *N.J.S.A.* 9:6–8.21(h) defines "day school" as including "a ... private school which provides ... special educational services to day students in grades kindergarten through 12." Because Blackacre Academy is a day school which provides special educational services, DYFS clearly had the authority and responsibility to conduct an investigation of the allegations of abuse at this school.

When DYFS receives a report of child abuse or neglect, it is required to "immediately" share that report with the county prosecutor. *N.J.S.A.* 9:6–8.36a. Although not expressly set forth in Title 9, we believe that DYFS has a comparable obligation to share information regarding alleged abuse or neglect at a day school with any government agency which has regulatory responsibilities over such an entity. *N.J.S.A.* 9:6–3.1(b) and (c) provide that if child abuse or neglect occurs at an institution, DYFS may request the chief administrator of the institution to take remedial action, and *N.J.S.A.* 9:6–3.1(d) provides that "[i]f a chief administrator ... does not formulate or implement a remedial plan or make any changes requested by [DYFS], [DYFS] may recommend to the authority which licenses, oversees, approves or authorizes the operation of the institution that appropriate sanctions or actions be enforced or taken against the institution." This subsection obviously contemplates that DYFS may communicate the results of an investigation of child abuse at an institution to any governmental agency which licenses or exercises other regulatory authority over the institution. Although there is no comparable section of Title 9 relating to day schools such as Blackacre Academy, we consider it implicit in DYFS' general obligation to "take such action as shall be necessary to insure the safety of the [allegedly abused or neglected] child," *N.J.S.A.* 9:6–8.11, that DYFS may share information of alleged abuse with another governmental agency which has direct regulatory responsibility over the facility in which the alleged abuse has occurred. *See*

*New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562, 384 *A.2d* 795 (1978) ("[t]he grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and ... the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent."). In fact, when the Legislature assigns overlapping regulatory responsibilities to two or more administrative agencies, there is a general presumption that those agencies will exercise their respective powers cooperatively in furtherance of the public interest. *See Hinfey v. Matawan Regional Bd. of Educ.*, 77 *N.J.* 514, 531–32, 391 *A.2d* 899 (1978). To construe Title 9 as not authorizing DYFS to transmit the results of its investigation of allegations of child abuse at a day school to the Department of Education, which is the agency with direct regulatory responsibility over the school, would be inconsistent with this salutary principle.

■ We reject appellants' argument that DYFS violated *N.J.S.A.* 9:6–8.10a by notifying the Department of Education and the parents of students who were allegedly abused at Blackacre Academy of the results of its investigation. *N.J.S.A.* 9:6–8.10a(b)(5) provides that DYFS may release the information obtained in an investigation of child abuse and its own findings to "[a]n agency authorized to care for, treat, or supervise a child who is the subject of a child abuse report, or a parent, guardian or other person who is responsible for the child's welfare, or both, when the information is needed in connection with the provision of care, treatment, or supervision to such child or such parent, guardian or other person." This subsection provides clear and direct authority for DYFS' dissemination of the results of its investigation to the parents of the Blackacre Academy students who were the subject of its report. Moreover, a day school and any teacher or other employee of a day school are considered "guardian[s]" of a child attending the school. *N.J.S.A.* 9:6–8.21a. Therefore, we believe that the Department of Education can be reasonably viewed as "an agency" which has the responsibility to

"supervise" the care and treatment provided to students while they are under the temporary guardianship of a day school, to which information of child abuse may be disseminated under the authority of *N.J.S.A.* 9:6–8:10a(b)(5). *But see In re Tenure Hearing of Tyler,* 236 *N.J.Super.* 478, 487–88, 566 *A.*2d 229 (App.Div. 1989) (information of child abuse not given to parent where information was not sought "in connection with the provision of care, treatment and supervision" of the child), *certif. denied,* 121 *N.J.* 615, 583 *A.*2d 315 (1990).

■ We also reject appellants' argument that DYFS may disseminate the results of an investigation of child abuse or neglect only when the allegations are "substantiated." Third parties may have as much of an interest in being informed that DYFS' investigation has not substantiated allegations of abuse or neglect or that its investigation has been inconclusive as in being informed that the allegations have been substantiated. In this case, both the Department of Education and the parents of students who were allegedly abused were aware that DYFS had undertaken an investigation. For the Department of Education to properly perform its regulatory responsibilities, it needed to be informed of the scope of DYFS' investigation and all of the conclusions reached as a result of that investigation, regardless of whether inculpatory, exculpatory or inconclusive. The Department of Education would have to determine, for example, whether simply to rely upon DYFS' investigation or to conduct its own supplemental investigation. Similarly, the parents had a manifest interest in being informed of the results of an investigation of alleged abuse by the school to which they had entrusted the education and care of their children.[4]

---

[4] We note that subsequent to the IAIU's transmittal of the results of its investigation to the parents of the children allegedly abused at Blackacre Academy, DYFS adopted *N.J.A.C.* 10:129A–3.4(f) which provides: "The Division representative shall advise, upon completion of the investigation, the parent or caretaker [of the allegedly abused child] ... [t]hat the investigation has been completed and the findings of the investigation."

Therefore, we conclude that DYFS acted within its statutory authority reporting the results of its investigation to the Department of Education and the parents of the students who were the subject of the investigation.

## II

We turn next to appellants' argument that the IAIU's investigatory findings must be reversed and all copies of its report destroyed because the IAIU failed to conduct a proper investigation. Specifically, appellants complain that the IAIU failed to establish the competency of the students from whom it took statements, used highly suggestive interrogation techniques which irreparably distorted the students' recollection of the alleged abuse, failed to consider the retaliatory motives of former Blackacre Academy employees who gave statements supporting the charges, failed to interview potential witnesses who could have provided exculpatory evidence, and failed to consider discrepancies between witness statements obtained by an IAIU investigator and a police detective during the same interviews. In addition, appellants argue that the IAIU's findings are not supported by substantial credible evidence and urge this court to conduct a *de novo* review of the IAIU's investigatory file. Significantly, appellants do not argue that the IAIU should have conducted an evidentiary hearing or seek a remand for a hearing. Rather, appellants' argument is that because the IAIU's investigation was deficient, the results of that investigation should be suppressed, or alternatively, that this court should undertake a *de novo* review of the statements and other documents produced in that investigation. Nevertheless, if the IAIU's actions were shown to be procedurally deficient, we would remand the matter for an evidentiary hearing or whatever other proceedings were required to correct that defect. Therefore, we must consider the nature of the administrative action involved in the IAIU's issuance of the Institutional Abuse and Neglect Report and the letters to the parents of students mentioned in that report, and whether the IAIU was required to conduct a formal or

informal hearing before disseminating the results of its investigation.

██ It is now firmly established that the "due process" requirements which govern the proceedings of an agency that makes binding legal determinations directly affecting legal rights do not apply to agency proceedings which are purely investigatory in nature. *See Hannah v. Larche,* 363 *U.S.* 420, 80 *S.Ct.* 1502, 4 *L.Ed.*2d 1307 (1960); *In re Zicarelli,* 55 *N.J.* 249, 257–58, 261, 261 *A.*2d 129 (1970), *aff'd,* 406 *U.S.* 472, 92 *S.Ct.* 1670, 32 *L.Ed.*2d 234 (1972); *Pelullo v. State Comm'n of Investigation,* 294 *N.J.Super.* 336, 683 *A.*2d 558 (App.Div.1996), *certif. denied,* 149 *N.J.* 35, 692 *A.*2d 48 (1997). As the Court noted in *Hannah v. Larche:*

> "Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used.
>
> [363 *U.S.* at 442, 80 *S.Ct.* at 1514–15, 4 *L.Ed.*2d at 1321.]

However, if a government agency publicly disseminates findings which adversely affect the subject of an investigation, the agency may be required as a matter of due process to establish procedures by which the investigatory findings may be challenged. *See Jenkins v. McKeithen,* 395 *U.S.* 411, 425–31, 89 *S.Ct.* 1843, 1850–54, 23 *L.Ed.*2d 404, 419–22 (1969); *Valmonte v. Bane,* 18 *F.*3d 992 (2d Cir.1994); *Lee TT. v. Dowling,* 87 *N.Y.*2d 699, 642 *N.Y.S.*2d 181, 664 *N.E.*2d 1243 (1996); *cf. Jackson v. W.,* 14 *Va.App.* 391, 419 *S.E.*2d 385, 393–98 (1992); *see also Doe v. Poritz,* 142 *N.J.* 1, 99–109, 662 *A.*2d 367 (1995); *Nicoletta v. North Jersey Dist. Water Supply Comm'n,* 77 *N.J.* 145, 154–62, 390 *A.*2d 90 (1978). In determining whether a person who has been adversely affected by government action is entitled to a hearing and, if so, the kind of hearing required, a court must weigh the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and

the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

[*Zinermon v. Burch,* 494 *U.S.* 113, 127, 110 *S.Ct.* 975, 984, 108 *L.Ed.*2d 100, 115 (1990) (quoting *Mathews v. Eldridge,* 424 *U.S.* 319, 335, 96 *S.Ct.* 893, 903, 47 *L.Ed.*2d 18, 33 (1976)).]

*Accord Doe v. Poritz, supra,* 142 *N.J.* at 106–07, 662 *A.*2d 367.

We recently applied these principles in *Pelullo v. State Comm'n of Investigation, supra,* which involved a challenge to the public dissemination by the State Commission of Investigation (SCI) of a report entitled "Organized Crime in Bars." Plaintiff, the owner of a bar who the report identified as an associate of members of organized crime, argued among other things that the SCI had violated his "State and Federal Constitutional right to reputation by publishing the report without affording [him] due process of law." 294 *N.J.Super.* at 339, 683 *A.*2d 558. In rejecting this argument, we noted that "plaintiff [had] received timely notice that he would be mentioned in a potentially critical context, pertinent excerpts of the report were read to his counsel, and he was given an opportunity to respond by sworn affidavit, which would have been included in the report." *Id.* at 348, 683 *A.*2d 558. We concluded that these safeguards afforded plaintiff sufficient protection against the disclosure of false information harmful to his reputation because the SCI "only served an investigatory, not an accusatory or adjudicative function." *Id.* at 351, 683 *A.*2d 558.

 The IAIU's transmittal to the Department of Education of a report describing the results of its investigation of allegations of child abuse at Blackacre Academy did not implicate any liberty or property interest which would entitle appellants to the due process protections required in adjudicatory proceedings. The IAIU's report does not purport to be an adjudication which would be binding upon the Department of Education; the purely investigatory nature of the IAIU's findings is clearly indicated by the report's final sentence which "recommend[s]" that the "Department of Education thoroughly evaluate the Blackacre Academy

with regard to the various findings of this investigation and take such actions as necessary to address the concerns raised regarding Dr. Doe's actions, staff's actions, training, and suspensions." Moreover, before the Department could suspend or revoke appellants' licenses or order them to take remedial action, it would be required to conduct an evidentiary hearing in conformity with the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B-1 to -15. Thus, the IAIU's transmittal of its investigatory report to the Department of Education is analogous to a local police department forwarding an incident report to the county prosecutor. *Cf. Lee TT. v. Dowling, supra,* 642 *N.Y.S.*2d at 187, 664 *N.E.*2d at 1249 ("[G]overnment[al] agencies commonly share information for law enforcement and investigative purposes"). A target of an investigation by a local police department cannot directly challenge the adequacy or fairness of the investigation or the police department's decision to forward the matter to the county prosecutor. Instead, his rights are fully protected by the opportunity to move for an order quashing any indictment that may be returned and to defend against the charges before a jury. Similarly, appellants' due process rights would be fully protected by the opportunity for an evidentiary hearing before the Department before their licenses could be revoked or they could be ordered to take remedial action.

■ The IAIU's transmittal of letters to the parents of students who were the subject of allegations of abuse also did not implicate a liberty or property interest which would entitle appellants to an adjudicatory proceeding. Since the IAIU interviewed those parents and their children, the parents were aware of the IAIU's investigation. Consequently, if the IAIU had failed to inform them of the results of the investigation, they could have speculated that the IAIU had not completed its investigation or had decided not to proceed against Blackacre Academy for reasons unrelated to the merits of the charges. Therefore, the IAIU could reasonably have concluded that it had a responsibility to inform these parents of the outcome of the investigation as related to their

children.[5] We also note that it is not uncommon for police
departments and other investigatory agencies to inform alleged
victims of crimes and other unlawful conduct of the results of
investigations into their charges. In fact, a victim of a crime has
the statutory right "[t]o be advised of case progress and final
disposition." *N.J.S.A.* 52:4B–36(k). Moreover, there is no basis
in this record for concluding that the IAIU intended or should
have anticipated that the dissemination of this information to the
parents would result in its dissemination to the general public.
Therefore, the possible damage to appellants from the dissemina-
tion of the results of the IAIU investigation to parents is too
speculative to invoke the protections of the Due Process Clause.
*Cf. Jackson v. W., supra,* 419 *S.E.*2d at 397.

We turn finally to the one circumstance which distinguishes the
IAIU's dissemination of the results of its investigation of Black-
acre Academy from a police department transmitting the results
of a criminal investigation to the county prosecutor and notifying
the alleged victims of its conclusions. This is the placement of the
IAIU's findings of "substantiated" abuse in the Central Registry,
see *N.J.S.A.* 9:6–8.11, thereby making those findings subject to
disclosure pursuant to *N.J.S.A.* 9:6–8.10a(b) to certain governmen-
tal agencies and other parties who the Legislature has decided
have a need to know such information.[6]

In *Valmonte v. Bane, supra,* 18 *F.*3d 992, the court held that the
State of New York's maintenance of a Central Register containing
the names of individuals against whom allegations of child abuse
or neglect had been found to be supported by "some credible

---

[5] We note that appellants' reply brief states that none of the parents removed
their children from Blackacre Academy after receiving letters from the IAIU.

[6] It is unclear from the record before us whether the names of all the
appellants, including Blackacre Academy, are placed in the Central Registry or
only Dr. Doe as the individual against whom the finding of substantiated abuse
was made. Although it is not material to the issues presented by this appeal, we
assume in the following discussion that the names of all appellants are included
in the Registry.

evidence" implicated a protectable liberty interest under the Due Process Clause of the Fourteenth Amendment. Under the applicable New York statutes, certain employers in the child care field are required to make inquiries to the Central Register to determine whether potential employees are included in the list. If a potential employee's name appears on the list, the employer can hire the person only if "the employer 'maintain[s] a written record ... of the specific reasons why such person was determined to be appropriate' for working in the child or health care field." *Id.* at 996 (quoting *N.Y.Soc.Serv.Law* § 424–a(2)(a) (McKinney 1992)). A person whose name is included in the Central Register is entitled to a hearing at which the allegation of abuse or neglect must be proved by a fair preponderance of the evidence only if an employer refuses to hire or terminates the person. The plaintiff in *Valmonte* asserted that she had been unable to obtain a position in the child care field because her name was listed in the Central Register. Under these circumstances, the court concluded that plaintiff had cognizable liberty interest in her inclusion in the Central Register:

> [T]he injury associated with the Central Register is not simply that it exists, or that the list is available to potential employers. The deprivation stems from the fact that employers *must* consult the list before hiring Valmonte, and if they choose to hire her must state the reasons in writing to the state.
>
> [*Id.* at 1002.]

The court also held that because the "some credible evidence" standard used to determine whether a person's name should be included in the Central Register "does not require the factfinder to weigh conflicting evidence," as it "merely requir[es] the local [Department of Social Services] to present the bare minimum of material credible evidence to support the allegations against the subject," *id.* at 1004, the use of this standard creates such a "high risk" of erroneous identification of a person as a child abuser that it denies due process of law. *Id.* at 1002–05.

Subsequent to the Second Circuit's decision in *Valmonte,* the New York Court of Appeals also concluded that the statutory scheme governing the inclusion of names in the Central Register

violates the Due Process Clause of the Fourteenth Amendment. *Lee TT. v. Dowling, supra,* 87 *N.Y.*2d 699, 642 *N.Y.S.*2d 181, 664 *N.E.*2d 1243. The court reasoned that:

> [The "some credible evidence" standard] imposes no duty on the fact finder to weigh conflicting evidence, no matter how substantial, and allows a report to be indicated if only one out of several believable items of evidence supports it.
>
> . . . .
>
> The most practical method of safeguarding subjects reported to the Central Register is to require a higher standard of proof before reports are substantiated. . . .
>
> We conclude that the Due Process Clause of the Federal Constitution requires the Department to substantiate reports of child abuse by a fair preponderance of the evidence before they may be disseminated to providers and licensing agencies as a screening device for future employment.

[*Id.*, 642 N.Y.S.2d at 189–90, 664 N.E.2d at 1251–52.]

■ We are satisfied that the IAIU's placement of appellants' names in the Central Registry does not implicate the kind of liberty or property interest which the courts in *Valmonte* and *Lee TT.* found to require essential procedural safeguards against the risk of erroneous identification of a child abuser. Initially, we note that New Jersey has not enacted any provision similar to the New York statute which requires employers in the child care field to determine whether a job applicant is listed in the Central Registry. More importantly, appellants have not identified any property or liberty interest which is directly affected by their inclusion in the Central Registry. In fact, appellants' briefs indicate that their primary concern relates not to the inclusion of their names in the Central Registry but rather the transmittal of the IAIU's investigatory report to the Department of Education. However, as previously discussed, the Department of Education may not take any action against appellants without first conducting an evidentiary hearing in which they would be afforded the full procedural protections of the APA. Therefore, even assuming that a party who could show direct adverse consequences of his or her inclusion in the Central Registry would be entitled to addition-

al procedural protections,[7] we conclude that appellants were not denied due process of law.

## III

■ The one remaining issue is whether there is a sufficient factual foundation for the IAIU's investigatory finding that the allegation of abuse as to J.R. was substantiated. Because the IAIU did not conduct a hearing, the record consists essentially of conflicting statements to investigators by J.R., Dr. Doe and employees of Blackacre Academy. Moreover, the IAIU's report does not analyze and evaluate this evidence and make findings of fact. Consequently, this court cannot review the IAIU's report as it would a final agency decision following a quasi-judicial hearing to determine whether the agency's findings are supported by substantial credible evidence in the record as a whole. However, it does not follow, as the appellants urge, that this court should undertake a *de novo* review of the record to determine whether the allegations of abuse are substantiated. Rather, we believe that our review of the IAIU's decision, as in other cases where an appellant's interest is not sufficiently substantial to require an evidentiary hearing, should be limited to whether the decision is arbitrary, capricious or unreasonable. *See Spalt v. New Jersey Dep't of Envtl. Protection*, 237 *N.J.Super.* 206, 214, 567 *A.2d* 264 (App.Div.1989), *certif. denied*, 122 *N.J.* 140, 584 *A.2d* 213 (1990); *Normandy Beach Improvement Ass'n v. Commissioner, Dep't of Envtl. Protection*, 193 *N.J.Super.* 57, 64–65, 472 *A.2d* 156 (App. Div.1983), *certif. denied*, 96 *N.J.* 305, 475 *A.2d* 596 (1984).

---

[7] DYFS indicates in its brief that subsequent to the IAIU's issuance of the Institutional Abuse and Neglect Report relating to appellants, it has adopted procedures under which "regional dispositional conferences" are afforded to parties with respect to whom allegations of child abuse are found to be "substantiated." See *N.J.A.C.* 10:129A–3.4(c)(3). Because these procedures were not adopted until after the IAIU's action which is the subject of this appeal and we have concluded that the IAIU's former procedures did not deny appellants due process of law under the circumstances of this case, we do not consider the adequacy of these new procedures.

■ We are satisfied that the record in this case contains an adequate factual basis for the IAIU's determination that the allegations of abuse as to J.R. were substantiated. That record included J.R.'s statement to a detective in the local police department, in which J.R. alleged that while he was fighting with another student, Dr. Doe grabbed him by the back of the neck and removed him from the room. According to J.R., Dr. Doe then took him to another room, where he pushed him onto a table and began choking him. After J.R. broke loose, Dr. Doe knocked him to the floor and stepped on his face. In addition, both the detective and an IAIU investigator observed a small dark scar on J.R.'s left eye which appeared to be the remnants of a black eye. On the other hand, Dr. Doe gave a statement to the IAIU in which he denied choking J.R., throwing him down or stepping on his face, and asserted that he only used the degree of force required to break-up the fight between J.R. and the other student. However, the IAIU evidently did not credit Dr. Doe's exculpatory version of the incident. Although a hearing might be required under other circumstances to resolve the conflicts between these statements, see *Valmonte v. Bane, supra,* we are satisfied that the evidence of abuse of J.R. obtained in the course of the IAIU's investigation was sufficient under these circumstances to support its finding that the allegation had been substantiated. We reiterate, however, that the Department of Education would be required to conduct an evidentiary hearing in conformity with the APA before it could revoke or suspend appellants' licenses or require any remedial action. We also assume that if the Department conducts a hearing and renders a final decision based on a complete record, the IAIU would reevaluate its findings of abuse and, if appropriate, remove appellants' names from the Central Registry based on that decision.

■ We make several final comments. As previously discussed, the Legislature has conferred the responsibility to regulate private day schools such as Blackacre Academy upon the

Department of Education. If the students at such a school are abused or neglected, the Department has the authority to revoke or suspend the school's license or order it to take appropriate remedial action. Although DYFS can investigate allegations of abuse at a day school, it does not have the authority to suspend the school's operations or to order the school to take remedial action. Thus, even though DYFS may be better equipped than the Department of Education to investigate allegations of abuse at a school such as Blackacre Academy, it should keep in mind that the Department has the primary authority and responsibility to regulate these schools. In view of the Department of Education's primary role, DYFS must promptly transmit to the Department any information it receives regarding allegations of abuse at such a school and the results of any investigation. We are concerned that in this case DYFS did not transmit its investigatory report to the Department of Education until fourteen months after it received the allegations of abuse at Blackacre Academy, even though its investigation apparently was completed eight months earlier. We also are concerned that the Department of Education, perhaps influenced by the pendency of this appeal, still apparently has not decided whether to initiate any kind of proceedings against the appellants. The Department should now complete its review of this matter expeditiously.

Affirmed.